## JOURNAL NEWSPAPERS, INC. ET AL. v. STATE OF MARYLAND ET AL.

[Nos. 1926 through 1932, September Term, 1982.]

*Per Curiam Orders filed February 25, 1983
and March 1, 1983.*

*Opinion filed March 4, 1983.*

The cause was argued before MORTON, MOYLAN and WILNER, JJ.

*Gregory M. Schmidt,* with whom were *Michael S. Horne, Covington & Burling, Warren S. Oliveri, Jr., King & Nordlinger, Kevin Michael O'Connell, Tietz & O'Connell, Carol D. Weisman* and *Janet Milne* on the brief, for appellants.

*Reginald W. Bours, III,* with whom was *John C. Monahan* on the brief, for appellees.

Submitted on brief by *Sherry A. Bindeman* for *Amicus Curiae,* The American Civil Liberties Union Fund of the National Capital Area et al.

WILNER, J., delivered the opinion of the Court.

By order dated February 25, 1983, and supplemental order dated March 1, 1983, this Court vacated a series of orders issued by the Circuit Court for Montgomery County on February 16, 1983, *nunc pro tunc* February 9, 1983.

Those orders of the Circuit Court pertained to seven pending criminal prosecutions. They had the effect of enjoining certain classes of individuals from making public comment about various aspects of those prosecutions and restricting public access to certain documents and proceedings that were, or would become, part of the prosecutions. We vacated the orders because we believed that they unduly intruded upon rights accorded to the appellant intervenors by the First and Fourteenth Amendments to the United States Constitution and by art. 40 of the Maryland Declaration of Rights. We now explain our action.

## Factual And Procedural Background

Commencing in or about March, 1981, and continuing for the next eighteen months, the Aspen Hill area of Montgomery County was beset by a series of rapes and assaults that appeared to be the handiwork of one person. Altogether, at least sixteen women ranging in age from eleven to thirty-eight reported being raped, robbed, or assaulted. The culprit was generally described as a young white male in his twenties. Most of the attacks occurred in the evening, and it seemed apparent that the assailant was familiar with the Aspen Hill neighborhood.

As might be expected, the situation engendered considerable alarm in the community, culminating in a town meeting on October 26, 1982, that was attended by some 600 people. Rewards were offered for information leading to the arrest of the assailant; the police sent mass mailings to area residents advising them how to secure their homes and asking them to report suspicious characters. Understandably, the local news media took more than a passing interest in the matter. A number of articles appeared in the press reporting some of the individual assaults, describing the fear in the community, and recounting the efforts being made to identify and capture "the Aspen Hill rapist."

In or about October, 1982, suspicion began to focus on the defendant herein, Timothy J. Buzbee. On November 4, 1982, the police presented to a District Court commissioner applications seeking a Statement of Charges against Mr. Buzbee in two of the open cases, one involving a robbery and one a rape. The applications were supported by the affidavits of investigating officers, in which they recounted not only their own actions and observations but also what they had learned from the victims and other persons. At some point, the Statements of Charges sought by the police were filed. The next evening, November 5, Buzbee was arrested in connection with yet another incident. He was observed following a young girl home and then peering in the window of her house; and he was arrested for trespass.

The police chief, presumably in an attempt to allay community apprehension, used the occasion of Buzbee's arrest to call a press conference and announce that the county police had apprehended "the Aspen Hill rapist." That too produced a flurry of articles and reports in both the print and electronic media, as to the initial arrest, the chief's comment, and the subsequent filing, on November 6, of another rape charge against Buzbee. Families of the victims, as well as neighbors, acquaintances, and family of Buzbee were interviewed and quoted.

On November 8, Buzbee was taken before the District Court for a bail review hearing. At that point, he had apparently been formally charged with robbery, rape, and trespassing. The hearing, attended by an overflow crowd, was also extensively reported.[1] Newspaper articles recounted the charges already filed, suggested that additional charges might subsequently be filed, and reported that bail had been denied by the court. Upon motion of defense counsel, and without apparent objection from anyone, the District Court ordered its files (which included the documents submitted by the police on November 4) sealed.

On November 18, 1982, Buzbee was indicted in one of the cases for robbery (No. 29681). The next day, six more multi-count indictments were filed, each charging him with rape (or in one case attempted rape) and other associated offenses (Nos. 29682-87). Upon the filing of these indictments, and on defense motion, the court extended the District Court order sealing the court files pending some further action in the Circuit Court.[2]

---

**1.** Buzbee had requested that the bail review hearing be closed, but the request was denied.

**2.** The order of November 18 extending the sealing is not in the record before us, and we are not certain whether it applied only to the District Court files (which existed with respect to only three of the seven cases) or whether it applied to the Circuit Court files in all seven cases. The parties apparently regarded it as applying to all seven cases.

On November 26, 1982, Buzbee filed a motion in the Circuit Court, in each of the seven cases, to confirm the District Court order and to restrict both access to and comment regarding the proceedings.

In the three cases originating with a Statement of Charges in the District Court (Nos. 29681, 29683, and 29685), Buzbee asked that the affidavits, police reports, and other material filed in support of the Statement of Charges remain sealed. He argued that those documents contained statements that would be inadmissible in evidence; that in the normal course of events those documents, as part of the District Court files, would become incorporated in the Circuit Court files; that, unless restricted, they would be open to public inspection; and that publication of such information would improperly prejudice him and deny him the opportunity to select a fair and impartial jury in the county.

In a more general vein, Buzbee complained that he proposed to file "numerous pre-trial motions, at least some of which would necessarily require statements of fact and discussions of legal theories, all of which could be reported in great detail by the press if unrestricted access to court files is permitted," and that the State "might file replies" to certain of those motions "discussing the nature of the evidence against the Defendant, or discussing his legal theories, or, perhaps, suggesting that the Defendant might be a danger to society if released on bond." Noting that the State intended to try the seven cases sequentially and that it refused to join his request to limit access to the court files, Buzbee asked the court:

(1) To conduct a hearing on his motion, to limit public access to that hearing, and, following the hearing, to "place reasonable and necessary restrictions on access to the court files herein, to the end that the files may be reviewed only by court personnel, counsel or employees of the [State's Attorney or Defense Counsel]";

(2) To order "reasonable restrictions on public comment" by court employees and by counsel; and

(3) To grant such further relief as may be necessary to assure a fair trial.

It does not appear from the record before us that the State ever answered Buzbee's motion, which remained pending until a hearing on January 20, 1983. In the meanwhile, a number of pleadings were filed in the seven cases, including a motion for discovery, a demand for particulars, and pleas of not guilty.

On January 10, 1983, Buzbee filed two suppression motions and a motion to dismiss certain counts of the indictments on grounds of vagueness. One of the suppression motions sought to suppress all physical evidence seized from Buzbee upon his arrest or obtained through the execution of subsequent search warrants, in support of which he claimed that the police had no probable cause to make the arrest or the searches, that the affidavits filed in support of the warrants were false, that the warrants were "over-broad," and that the police had exceeded the scope of their authority.

The second suppression motion sought to exclude statements made by Buzbee following his arrest. Acknowledging in the first motion that he "made no confession as such," Buzbee nevertheless claimed that, as a result of continued "conversations and interrogations" by the police after he had invoked his right to counsel, he had "responded to ambiguous inquiries concerning his possible involvement in alleged crimes." [3] It was those responses he asked be suppressed.

The next event was Buzbee's trial, in the District Court, on the trespassing charge. That trial occurred on January

---

**3.** At the January 20, 1983, hearing on the motion to restrict access, counsel again made clear that Buzbee had not confessed. The statements, he said,

"are simply conversations between the police and Mr. Buzbee before his lawyer arrived on the scene *and we don't know whether the prosecutor is even going to offer them [at] trial because they don't constitute direct admissions of guilt,* but there may be some shades of meaning in the language that the prosecutor may wish to offer at the time of trial." (Emphasis supplied.)

17, 1983, and it was open to the public.[4] He was convicted.

On January 20, 1983, the court conducted a hearing on Buzbee's motion for restricted access. Although the hearing itself was "open," it does not appear that anyone other than counsel, Buzbee, Buzbee's father, and the usual court personnel was present. In support of the motion, Buzbee offered

(1) a series of newspaper articles that had appeared over a three-month period concerning his arrest, the bail review hearing, and his trial (and conviction) on the trespassing charge;

(2) video tapes of excerpts from local television broadcasts on November 6, 1982, reporting his arrest, and January 17, 1983, reporting his conviction on the trespassing charge; and

(3) the fact that the State's Attorney's Office and the chief of police had given interviews to the press regarding the case. The prosecutor's statements were limited to (a) recounting what had occurred at the bail review hearing (which, as noted, was open to the public), (b) upon the filing of the indictments, describing the nature of the charges, the dates of the alleged offenses, and the general location of the crimes, and (c) releasing the date of the suppression hearing and the expected trial dates.

Evidence was also offered of interviews granted by Buzbee's family, including his father's allowing a reporter to go through the father's home, where one or more of the rapes allegedly took place.

Notwithstanding the more limited breadth of the motion itself, counsel made clear at the hearing that what he wanted was (1) to "totally seal all seven court trials in this case," (2) to restrict access by the public in general and the news media in particular "from all pre-trial evidentiary hearings," (3) a "reasonable gag order," and (4) the sealing of all court files in the cases.

After hearing argument, the court made two basic

---

4. Buzbee had moved to close that trial and to restrict access to the tape recording of it, but, as with the bail review hearing, his request was denied.

findings — (1) that "there has been very substantial publicity in connection with this particular case. . ." and (2) that this publicity has not "been so overriding as to in effect have crept into the minds of everyone in Montgomery County as to having made a decision on this particular case or having been biased by it." Consistent with that second conclusion, the court did not find, or even suggest, that the publicity to date had been unfair, unbalanced, or factually erroneous; nor did it make any findings with respect to the type of publicity that would likely ensue if Buzbee's motion were denied, in whole or in part. Nor, finally, did the court examine in any detail the extent to which alternative measures of a type we shall shortly discuss could be used to avert or mitigate the effect of any prejudicial publicity that might result from keeping the proceedings open.

Rather, based apparently upon the mere fact of previous extensive publicity, the court decided (1) to keep sealed the applications for Statement of Charges in the three District Court files, (2) to close the hearing on Buzbee's motions to suppress, but to permit the hearing judge to release all or part of the tape recording of the hearing afterward, (3) to seal temporarily all pleadings and documents subsequently filed in the case, subject to agreement of the parties or further court order, (4) to keep the court files sealed until February 28, and (5) to impose a "gag" order of some type. Counsel was directed to prepare appropriate orders for submission on February 28.

At some point, the local press found out about what had occurred. On January 27, 1983, Journal Newspapers, Inc., publisher of the *Montgomery Journal,* petitioned to intervene in the case in order to oppose the restrictions about to be ordered by the court. *See News American v. State,* 294 Md. 30 (1982). This was followed, on February 8 and 9, 1983, by similar motions on the part of the Washington Post Company and Morkap Publishing Company, Inc., t/a The *Sentinel* Newspapers. Faced with these petitions, the court scheduled another hearing on the matter for February 9, 1983.

At that hearing, the court permitted the requested interventions and listened to argument from all sides. Except for the admission of six additional newspaper articles and testimony from a lawyer as to problems he had encountered with undue publicity in another case that had been tried a year earlier, nothing was added to the evidentiary record made at the January 20 hearing. At the court's direction, counsel had prepared a series of orders implementing the decisions announced by the court at the earlier hearing; and, without any further findings of significance, the court, on February 16, 1983, signed those orders.

Throughout the February 9 hearing, the court expressed concern over the uncertainty of what might emerge from the suppression hearing or from future pleadings and documents. Its attention was not focused upon any specific statement or piece of evidence that might be so unduly publicized as to endanger any reasonable prospect of a fair trial. Nor, though brought to its attention, did the court examine critically the various alternative and less restrictive methods of ameliorating any such prejudice.

Four orders were signed by the court.

(1) Paper 51, which applied only to the three cases originating in the District Court (Nos. 29681, 29683, and 29685), directed the clerk to remove from the respective files the Application for Statement of Charges and the Statement of Probable Cause/Application and, absent some further order of the court, to keep it "sealed from ordinary public inspection." All other papers filed prior to February 9, 1983, were to be open for public inspection.

(2) Paper 52 — the "gag" order — enjoined certain classes of people from making any extrajudicial statement concerning (a) Buzbee's character, reputation, or criminal record, (b) the existence or contents of any statements made by him, (c) the performance of any tests or his refusal to submit to such tests, (d) the identity, testimony, or credibility of prospective witnesses, (e) the possibility of a plea bargain, (f) any opinion as to Buzbee's guilt, the merits of the case, or evidence in the case, or (g) information regarding *in camera*

proceedings. Subject to this order were counsel and their employees, all court personnel, the county police department, Buzbee's immediate family and any other relative of his residing in Montgomery County, and "each witness for both sides."[5]

(3) Paper 53 set forth a requirement and procedure for the sealing of future documents and pleadings. Essentially, all such papers filed by the State would be sealed for three days, during which period Buzbee could move to have them remain sealed. Absent a court order to the contrary, they would become open to inspection at the end of the three-day period. Documents filed on behalf of Buzbee would be open unless counsel directed that they be sealed. In the event of any dispute over sealing, the court, after hearing, would decide the matter.

(4) Paper 54 excluded the press and the public from the hearing scheduled for February 28 on Buzbee's two suppression motions, but provided that, at the conclusion of such hearing, the judge, in his/her discretion, could release all or part of the tapes and transcripts of the hearing.

These are the orders that were before us for review in an appeal brought by the intervening newspapers.

### Discussion

In *Patuxent Publishing Corp. v. State,* 48 Md.App. 689 (1981), this Court attempted to blend and encapsulate the basic rules in this area laid down by the Supreme Court. The Court of Appeals made a similar endeavor in *News American v. State,* 294 Md. 30 (1982), but, because it declared the substantive question moot, its pronouncements amount only to *dicta.* We are dealing, of course, with the possible friction between two very precious Constitutional

---

5. The first of the seven trials was scheduled to begin on March 14, 1983, the others to follow sequentially at two-week intervals. At that point, it is not clear that either side knew who all of the witnesses would be. Even less clear, of course, is that the people who ultimately might be called as witnesses would know that fact, and thus be aware that they might be subject to this order.

rights — that of a defendant in a criminal case to a fair and speedy trial in the vicinage of the crime (U.S. Constitution, Amendment VI; Md. Decl. of Rts., arts. 20, 21) and that of free speech and free press (U.S. Constitution, Amendment I; Md. Decl. of Rts., art. 40). The question is how to balance them — how to avert a collision between them.

The need to balance these rights has long been recognized. The press cannot, under the guise of the First Amendment, be allowed to run roughshod over the correlative rights of the defendant and make a mockery of the judicial process (*Estes v. Texas,* 381 U.S. 532, *reh. den.* 382 U.S. 875 (1965); *Sheppard v. Maxwell,* 384 U.S. 333 (1966)); but neither can the public's right to know about and discuss the workings of that process be shut off at the defendant's (or the State's) whim. If, as now seems the case, the public has no Sixth Amendment right of access to judicial proceedings (*Gannett Co. v. DePasquale,* 443 U.S. 368 (1979)), it does have such a right under the First Amendment. *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555 (1980); *Globe Newspapers Co. v. Superior Court,* 457 U.S. 596, 102 S.Ct. 2613 (1982).

Although in terms of actual holding the Supreme Court has explicitly recognized a First Amendment right of access only with respect to the trial itself, by examining the Opinions of the various Justices and extrapolating the principles enunciated therein, most of the Courts since *Richmond* and *Globe* have regarded that right as applying as well to pretrial judicial proceedings. *See, for example, United States v. Brooklier,* 685 F.2d 1162 (9th Cir. 1982); *United States v. Criden,* 675 F.2d 550 (3d Cir. 1982); *United States v. Edwards,* 430 A.2d 1321 (D.C.App. 1981), *cert. den.* 102 S.Ct. 1721 (1982); *Richmond Newspapers, Inc. v. Com.,* 281 S.E.2d 915 (Va. 1981); *United States v. Pageau,* 526 F.Supp. 1221 (N.D. N.Y. 1981); and *cf. Seattle Times Co. v. Ishikawa,* 640 P.2d 716 (Wash. 1982), reaching that conclusion on State law grounds. That is the conclusion we reached in *Patuxent Publishing Corp. v. State, supra,* 48 Md.App. 689, 693.

It is not just a matter of predicting how the individual Justices might vote if presented squarely with the issue; it

is, instead, a question of reason and logic. What justifies the "constitutionalization," through application of the First Amendment free speech and press clause, of public access to a trial is the legitimate interest that the public has in observing the working of its judicial and criminal justice systems, to ensure that they are both fair and effective. That same interest exists with respect to pretrial judicial proceedings. If the policeman has misbehaved and as a result has caused valuable evidence to become forfeit, if a request is made to move the trial, or delay it, or to disqualify the judge, or to set or revoke bail — the public has a compelling interest in these things and thus a right to observe the decisional process. Indeed, in a democratic society, these matters are likely to be of even greater interest than the guilt or innocence of a particular defendant. *See Gannett Co. v. DePasquale, supra,* 443 U.S. at 435-36 (Blackmun, J. concurring in part and dissenting in part); *United States v. Criden, supra,* 675 F.2d 550, 557.

When dealing with the potential clash between such broad and basic rights, the balance must necessarily be a flexible one. There is no magic matrix or bright line by which the decision to open or to close can be made. The presumption is in favor of openness. As stated for the Court in *Globe Newspaper Co., supra,* 102 S.Ct. at 2620:

> "[T]he circumstances under which the press and public can be barred from a criminal trial are limited; the State's justification in denying access must be a weighty one. Where, as in the present case, the State attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest."

This principle, expressed in terms of the State's burden because in *Globe* the State was the party seeking closure, necessarily applies to whoever is seeking the closure. The one who would exclude the public has the burden of estab-

lishing the "compelling governmental interest" and the "narrowly tailored" means of achieving it. That burden exists whatever the nature or form of the exclusion, *i.e.*, a closed hearing, a "gag" on comment, or a sealing of files and documents.

· The issue becomes a bit complicated when we consider the fact that orders of this type are themselves legitimate devices through which, in an appropriate case, a fair balance may be struck, especially when dealing with pretrial proceedings at which evidence may be disclosed that will be deemed inadmissible at trial. *See Revised Free Press — Fair Trial Guidelines Of The Judicial Conference Of The United States — 1980,* Revised Report Of The Judicial Conference Committee On The Operation Of The Jury System On The "Free Press — Fair Trial" Issue, 87 F.R.D. 518, 525, *et seq.* But they too must be lined up on the Constitutional continuum.

The movant's burden is to establish, first, the need for *any* restriction on public access; failing that, there is no occasion to consider the *form* of restriction. Only if that initial burden is met should the court proceed to look at the alternative methods of implementing the restriction, choosing always that or those which will do the job in the least intrusive and onerous manner. The problem here is that the threshold burden was never met.

Before considering infringements of any type on public access, the court must be satisfied, on the basis of clear and convincing evidence, that alternative methods of protecting the defendant's Sixth Amendment rights not involving a First Amendment infringement will be unavailing. There must be a reasonable showing that time-honored techniques such as continuance, change of venue, voir dire, conducting hearings and drafting pleadings in such manner as to avoid disclosure of the damaging material would be inadequate or impractical.[6] As we stated in *Patuxent Publishing Corp. v.*

---

**6.** It is not always necessary, for example, to disclose the statements made by the defendant or the nature of the physical evidence taken from him, where the issue is not *what* was said or taken but the circumstances under which it was said or taken.

*State, supra,* 48 Md.App. at 693, "[t]hese alternative sanctions may, indeed, work some inconvenience and dislocation upon the parties (including criminal defendants) but are nonetheless, on balance, to be preferred to curtailing the First Amendment freedom of the press."

We follow the approach of the Ninth Circuit Court of Appeals in *United States v. Brooklier, supra,* 685 F.2d 1162, 1167-69, taken in turn from Justice Blackmun's concurrence and dissent in *Gannett* — that

> (1) "An accused who seeks closure must establish 'that it is strictly and inescapably necessary in order to protect the fair-trial guarantee.' This burden may be discharged by demonstrating: (1) 'a substantial probability that irreparable damage to his fair-trial right will result from conducting the proceeding in public'; (2) 'a substantial probability that alternatives to closure will not protect adequately his right to a fair trial'; and (3) 'a substantial probability that closure will be effective in protecting against the perceived harm.'"

> and

> (2) The court's consideration of and findings on these matters and the evidence in support of those findings must appear in the record. *Cf. United States v. Criden, supra,* 675 F.2d at 561, expressing this requirement on nonconstitutional grounds.

The record in this case does not suffice to meet this test. Aside from speculation based on the fact that the case had been extensively reported in the past, there was no showing of a substantial probability of irreparable damage from the absence of closure; nor was there a showing of substantial probability that alternatives to closure would be inadequate

to avert or mitigate such damage. This record gives no clear indication that the court critically examined all of the possible alternatives and found them all wanting.

The trial judge in this case was by no means callous or uncaring with respect to right of public access. She recognized the competing interests and attempted to strike a fair balance. We simply think that, in light of the record before us and upon the authorities cited, the balance must be struck closer to the First Amendment than to the Sixth. We strike that balance as well under the analogous provisions of our State Constitution.

That is why we vacated the four orders.