542 A.2d 859

**STATE of Maryland**

v.

**COTTMAN TRANSMISSION SYSTEMS, INC.**

**No. 475, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

July 6, 1988.

648

J. Joseph Curran, Jr., Atty. Gen. (William Leibovici, Peter V. Berns, Lucy A. Weisz and William D. Gruhn, Asst. Attys. Gen., on the brief), Baltimore, for appellant.

Douglas Connah, Baltimore, for movant, The Baltimore Sun Co.

Stephen Horn (Robert L. Zisk, Patrick O. Cavanaugh and Schmeltzer, Aptaker & Sheppard, P.C., on the brief), Washington, D.C., for appellee.

Argued before GILBERT, C.J., and BLOOM and POLLITT, JJ.

GILBERT, Chief Judge.

At the conclusion of an emergency hearing, this Court issued the following per curiam order:

"For reasons to be stated in an opinion to be hereafter filed, it is this 14th day of June, 1988, by the Court of Special Appeals,

ORDERED that the written Order of the Circuit Court for Baltimore City dated April 26, 1988 and filed April 27, 1988 and the oral Order of May 25, 1988 with respect to the closing of proceedings and sealing of the file be, and they are hereby, vacated; and

It is further ORDERED that the "Gag" Order be, and it is hereby, modified by vacating it in all respects except as to the extra-judicial communications with the media relative to the merits of the case. Costs to be divided between the appellant and the appellee. Mandate to issue forthwith."

We now explain why we took that action.

The orders of the circuit court dated April 27 and May 25, 1988 concerned a pending civil suit brought by the Attorney General under the authority of the Maryland Consumer Protection Act, Md. Code Commercial Law Article Ann. § 13–101, *et seq.*, against Cottman Transmission Systems, Inc. (Cottman), a Pennsylvania corporation. The circuit court's order of April 27 sealed the case files and closed the proceedings to the public. The order of May 24 restated the closure of the case files and proceedings. Additionally, it enjoined any communications by the State with the media insofar as the case was concerned.

### The Background

Cottman is a franchisor of approximately 150 automotive transmission repair centers situated throughout the United States. Thirteen of those centers currently exist in the State of Maryland. Eleven centers are operated by Cottman franchisees; two are managed by Cottman corporate affiliates.

Representatives of both the Attorney General and Cottman met in the fall of 1987 to discuss allegedly fraudulent activities committed in Maryland at repair centers bearing the Cottman name. Central to the discussions was the methodology of Cottman's franchisees in providing transmission repair cost estimates to consumers. According to the State, Cottman's "Remove, Check, and Install" (RCI) program constituted a deceptive scheme that kept "consumers in the dark about the problems with their [vehicle's] transmissions until after the consumer ... paid a substantial fee to have the transmission disassembled." The State contended that Cottman's sales techniques were designed to withhold material information from consumers in order to increase sales and simultaneously encourage consumers to sanction expensive "teardown" inspections when Cottman actually already knew that extensive repairs were necessary. Cottman, however, insisted that the total cost of any internal repair cannot be determined accurately unless the transmission is removed from the vehicle, disassembled, and inspected.

Apparently either to foreclose the Attorney General's investigation or to precipitate premature action by him, Cottman, on December 23, 1987 in the Circuit Court for Montgomery County, filed a declaratory judgment action against the State. In the suit Cottman sought a declaration that its RCI method of estimating transmission repair costs conformed to the Automotive Repair Facilities Act, Md. Com. Law Art. §§ 14–1001, *et seq.*

Approximately one month thereafter, the Attorney Gener-

al brought a four-count complaint[1] against Cottman in the Circuit Court for Baltimore City. The suit alleges that Cottman:

1) misleads consumers into believing that information necessary for providing an accurate estimate can only be obtained through removal and inspection of the transmission,

2) induces consumers to authorize and pay for unnecessary repairs,

3) charges consumers for repairs not made, and

4) fails to provide consumers who purchase the RCI teardown inspection with a written estimate of parts and labor costs as required by § 14–1002 of the Automotive Repair Facilities Act and § 13–303 of the Consumer Protection Act as defined under § 13–301(13)(vi).

Concomitantly, the State issued a news release which outlined the contents of the complaint, characterized the charges against Cottman as "the result of a lengthy investigation by the Consumer Protection Division into the transmissions industry," and depicted the filing of the suit as "a last resort after four months of discussions with Cottman were unsuccessful."

The record reveals that, after the issuance of the news release, overall gross sales at Cottman's Maryland centers plummeted 35 percent. For the five-month period immediately prior to the filing of the Attorney General's suit and the resultant publicity thereon, the same repair centers enjoyed a 3.8 percent increase in gross sales compared to the gross sales for the same period of the previous year. The results of the sharp drop in sales were that a number of employees were laid off by the various centers, important sources of credit were lost, and one franchisee closed his repair center.

---

**1.** Cottman voluntarily dismissed the declaratory judgment action on May 3, 1988 and incorporated the claims asserted in it as defenses to the State's suit.

On March 24, 1988 the Attorney General filed a Motion for an Interlocutory Injunction pursuant to Md.Code Com.Law Art. Ann. § 14-406(a), to halt forthwith Cottman's allegedly unfair and deceptive trade practices. The Attorney General planned a news release in conjunction with that motion. Before the release was effected, Cottman moved for a preliminary injunction to restrain the State from issuing the news release. The release would have highlighted details of the State's memorandum made in support of its motion. The memorandum particularized purported evidence gathered by the State during an undercover investigation. No hearing on Cottman's motion occurred because it was withdrawn when the parties agreed voluntarily that the Attorney General could respond to media inquiries but not initiate contact with the media until three days before the hearing on the State's motion for interlocutory injunction. The hearing was set for June 28, 1988.

A conference ensued in chambers of the trial judge on April 26, 1988. At the conclusion of that conference, the judge issued the following order, *sua sponte:*

"For the reasons stated in chambers on April 26, 1988, it is hereby

ORDERED that as of April 26, 1988, this case and all files pertaining to it shall be sealed and shall not be opened except upon order of the Court;

ORDERED that the courtroom shall be closed to all persons other than counsel for the parties, the parties, and the Defendant's licensees and their representatives, for the oral argument that has been scheduled for May 9, 1988; and further

ORDERED that the courtroom shall be closed to all persons other than counsel for the parties, the parties, the Defendant's licensees and their representatives, the parties' expert witnesses, and such other witnesses as may be called to testify for the hearing on Plaintiff's motion for an interlocutory injunction."

The State filed a Motion for Reconsideration of the closure order, and a hearing thereon was held on May 25, 1988. At that hearing Cottman presented the testimony of three franchisees and a Cottman Vice President. All three of the repair center owners told the court that sales had declined dramatically after the Attorney General's January news release and that, as a result, employees had been discharged because of lack of work. The Vice President of Cottman related to the judge that, since the news release, gross sales had fallen 35 percent in Maryland. At the termination of the hearing, the judge ordered:

"[T]his case and all the files pertaining to it shall be sealed and shall not been [sic] opened except upon order of this Court.

[T]hat the Court room shall be closed to all persons other than counsel for the parties, the parties, the defendant licensees and their representatives, the parties' expert witnesses and such other witnesses as may be called to testify, and if we have an Order of Sequestration that may have to be amended.

[T]hat there ... [are] to be no communications with the press until ... June 28th date, at which time I will consider this matter prior to beginning the injunctive hearing, and if there are any new developments, the State, as well as the Defendant, will have an opportunity to present them to the Court and I will again consider whether the press will be permitted to sit through the proceedings. That is something that we will have to consider as soon as we convene on the 28th, and I am concerned about anything that may take place between now and the 28th date, and my order closing the courtroom is as to any hearing that may occur between now and the 28th date, and whether the injunction hearing will be open to the press, as I have indicated, is something I will consider on the 28th."

The Attorney General promptly appealed the orders of April 27, 1988 and May 25, 1988. The Baltimore Sunpapers

was granted permission to intervene in the public interest for purposes of argument before this Court.

The State raised two questions with respect to the closure orders:

1. Were the orders violative of the common law and constitutional privileges guaranteeing parties the right to try civil cases in a public forum?

2. Did the circuit court exceed its authority by imposing a "gag order" on the Attorney General of Maryland?

### Public Access to Court Proceedings

None of the parties challenged the underlying assumption that the public has the same right of access to civil proceedings as to criminal proceedings. Nevertheless, neither the Supreme Court nor either Maryland appellate court has heretofore directly addressed the subject. The Supreme Court, however, has obliquely commented on the matter. Justice Potter Stewart, writing for the Court in *Gannett Co. v. DePasquale*, 443 U.S. 368, 386–87 n. 15, 99 S.Ct. 2898, 2908–09 n. 15, 61 L.Ed.2d 608 (1979), a criminal case, said:

"For many centuries, both civil and criminal trials have traditionally been open to the public. As early as 1685, Sir John Hawles commented that open proceedings were necessary so 'that truth may be discovered in civil *as well as* criminal matters' (emphasis added). Remarks upon Mr. Cornish's Trial, 11 How.St.Tri. 455, 460. English commentators also assumed that the common-law rule was that the public could attend civil and criminal trials without distinguishing between the two. *E.g*, 2 E. Coke, Institutes of the Laws of England 103 (6th ed. 1681) ('all Causes ought to be heard ... openly in the Kings Court'); 3 W. Blackstone, Commentaries *372; M. Hale, The History of the Common Law of England 343, 345 (6th ed. 1820); E. Jenks, The Book of English Law 73–74 (6th ed. 1967).

The experience in the American Colonies was analogous. From the beginning, the norm was open trials. Indeed, the 1677 New Jersey Constitution provided that

any person could attend a trial whether it was 'civil *or* criminal,' Concessions and Agreements of West New Jersey (1677), ch. XXIII, quoted in 1 B. Schwartz, The Bill of Rights: A Documentary History 129 (1971) (emphasis added). Similarly, the 1682 and 1776 Pennsylvania Constitutions both provided that 'all courts shall be open,' 1 Schwartz, *supra,* at 140, 271 (emphasis added).

. . . .

Indeed, many of the advantages of public criminal trials are equally applicable in the civil trial context. While the operation of the judicial process in civil cases is often of interest only to the parties in the litigation, this is not always the case. *E.g., Dred Scott v. Sandford,* 19 How. 393 [15 L.Ed. 691]; *Plessy v. Ferguson,* 163 U.S. 537 [16 S.Ct. 1138, 41 L.Ed. 256]; *Brown v. Board of Education,* 347 U.S. 483 [74 S.Ct. 686, 98 L.Ed. 873]; *University of California Regents v. Bakke,* 438 U.S. 265 [98 S.Ct. 2733, 57 L.Ed.2d 750]. Thus, in some civil cases the public interest in access, and the salutary effect of publicity, may be as strong as, or stronger than, in most criminal cases."

The following year Chief Justice Burger noted in another criminal case, *Richmond Newspapers, Inc. v. Virginia,* that "historically both civil and criminal trials have been presumptively open." 448 U.S. 555, 580 n. 17, 100 S.Ct. 2814, 2829 n. 17, 65 L.Ed.2d 973 (1980).

The federal courts have applied the Supreme Court's *Richmond* and *Gannett* language so as to embrace civil proceedings. *See, e.g. Rushford v. The New Yorker Magazine,* 846 F.2d 249 (4th Cir.1988); *F.T.C. v. Standard Financial Management Corp.,* 830 F.2d 404 (1st Cir.1987); *Publicker Industries v. Cohen,* 733 F.2d 1059 (3rd Cir. 1984); *In Matter of Continental Illinois Securities Litigation,* 732 F.2d 1302 (7th Cir.1984); *Brown & Williamson Tobacco Corp. v. F.T.C.,* 710 F.2d 1165 (6th Cir.1983); *Newman v. Graddick,* 696 F.2d 796 (11th Cir.1983); *Joy v. North,* 692 F.2d 880 (2nd Cir.1982).

In *Globe Newspapers Co. v. Superior Court,* 457 U.S. 596, 611, 102 S.Ct. 2613, 2622, 73 L.Ed.2d 248 (1982), Justice Brennan summarized the policy justifications for open criminal trials:

"[T]he right of access to criminal trials plays a particularly significant role in the functioning of the judicial process and the government as a whole. Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process, with benefits to both the defendant and to society as a whole. Moreover, public access to the criminal trial fosters an appearance of fairness, thereby heightening public respect for the judicial process. And in the broadest terms, public access to criminal trials permits the public to participate in and serve as a check upon the judicial process—an essential component in our structure of self-government. In sum, the institutional value of the open criminal trial is recognized in both logic and experience." (Footnotes omitted).

457 U.S. at 606, 102 S.Ct. at 2619–20. The policy considerations buttressing the public's common law and First Amendment access rights apply equally to civil and criminal actions. *Publicker Industries v. Cohen,* 733 F.2d at 1070; *Brown & Williamson Tobacco Corp. v. F.T.C.,* 710 F.2d at 1177–79.

The right of access by the public to trials in Maryland courts is predicated on the First and Fourteenth Amendments of the Constitution of the United States and Article 40 of the Maryland Declaration of Rights. *Buzbee v. Journal Newspapers, Inc.,* 297 Md. 68, 76, 465 A.2d 426 (1983). That access applies to pre-trial proceedings, *id.* at 74, 465 A.2d 426; trial, *Erman v. State,* 49 Md.App. 605, 434 A.2d 1030 (1981); and court records, *Hearst Corp. v. State,* 60 Md.App. 651, 484 A.2d 292 (1984). Yet, the public access to proceedings and records is not absolute. *Id.*

Although a presumption of openness exists, a trial court may limit that right "when an important countervailing interest is shown." *Publicker Industries, Inc. v. Cohen,* 733 F.2d at 1071. The party seeking closure bears the

burden of establishing the need to restrict the public's access. *Journal Newspapers v. State,* 54 Md.App. 98, 110, 456 A.2d 963, *aff'd sub nom, Buzbee v. Journal Newspapers,* 297 Md. 68, 465 A.2d 426 (1983). Since the right of public access is firmly imbedded in the First Amendment, "it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Globe Newspapers Co. v. Superior Court,* 457 U.S. 596 at 607, 102 S.Ct. 2613 at 2620; *Rushford v. The New Yorker Magazine, supra.*

In *Press–Enterprise Co. v. Superior Court,* 464 U.S. 501, 510, 104 S.Ct. 819, 824, 78 L.Ed.2d 629 (1984), the Supreme Court declared:

> "The presumption of openness may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered."

The trial judge in the instant matter found that "this is a case that could effectively be tried in the press, because if there are press releases and the organization is shut down in Maryland, the case is moot." [2]

■ Other than a right to a fair trial, interests compelling enough to overcome the presumption of openness usually take the form of a privacy right. *See Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984) (protective orders for discovery materials); *In Re Knoxville News–Sentinel Co., Inc.,* 723 F.2d 470 (6th Cir. 1983) (personal financial records of innocent third parties); *Megapulse Inc. v. Lewis,* 672 F.2d 959 (D.C.Cir.1982) (trade

---

**2.** That observation may be incorrect. Cottman was sued as Cottman Transmission Systems, Inc., a Pennsylvania Corporation doing business in Maryland. How the "organization ... shut down in Maryland" would moot the case is not explained. Why the litigation could not and would not continue even if the local franchised dealerships are closed is not answered.

secrets); *Schaffer v. Kissinger,* 505 F.2d 389 (D.C.Cir.1974) (national security secrets); *Park v. Detroit Free Press Co.,* 72 Mich. 560, 40 N.W. 731 (1888) (libelous statements); *In Re Caswell,* 18 R.I. 835, 29 A. 259 (1893) (details of a divorce). No privacy right has been suggested as justification for closure. Instead, Cottman sought the protective cloak of secrecy in order to minimize damage to its reputation. Possible harm to a corporate reputation does not serve to surmount the strong presumption in favor of public access to court proceedings and records. *Brown & Williamson Tobacco Corp,* 710 F.2d at 1179. Injury to corporate or personal reputation is an inherent risk in almost every civil suit. For example, the physician, lawyer, C.P.A., or other professional sued for malpractice may be devastated financially by a plaintiff's filing of a suit against him or her, but in those instances the courts do not close the proceedings and records to shield the individual's professional reputation. Commenting upon the natural desire of persons to protect against prejudicial information contained in judicial proceedings, the Sixth Circuit said in *Brown & Williamson Tobacco Corp. v. F.T.C., supra:*

> "This desire, however, cannot be accommodated by courts without seriously undermining the tradition of an open justice system. Indeed, common sense tells us that the greater the motivation a corporation has to shield its operations, the greater the public's need to know."

710 F.2d at 1180. Because Cottman failed to demonstrate an interest that was sufficient to eclipse the strong presumption in favor of public access, we held that the proceedings and records should be open to the public and the media.[3]

---

**3.** Chief Justice Burger, in *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 572–73, 100 S.Ct. 2814, 2825, 65 L.Ed.2d 973 (1980), remarked:

> "Instead of acquiring information about trials by firsthand observation or by word of mouth from those who attended, people now acquire it chiefly through the print and electronic media. In a sense, this validates the media claim of functioning as surrogates

▌ To close a court to public scrutiny of the proceedings is to shut off the light of the law. How else will the citizenry learn of the happenings in the courts—their government's third branch—except through access to the courts by the people themselves or through reports supplied them by the media? The right of the individual to a fair trial must be protected, but that protection does not include safeguarding reputations. An individual or corporate entity involved as a party to a civil case is entitled to a fair trial, not a private one.

### The "Gag Order"

▌ The "gag order" issued by the trial court that "there is to be no communications with the press until this June 28th date" was too sweeping. It was an impermissible prior restraint on the Attorney General's right of free speech. Although any prior restraint of speech carries a "heavy presumption" of constitutional invalidity, *Carroll v. President and Commissioners of Princess Anne*, 393 U.S. 175, 181, 89 S.Ct. 347, 351, 21 L.Ed.2d 325 (1968), the "gag" may be upheld: 1) if the party seeking the order can establish that the speech to be restrained poses 'a serious and imminent threat' of interference with the fair administration of justice," *Chicago Council of Lawyers v. Bauer*, 522 F.2d 242, 249 (7th Cir.1975), *cert. denied*, 427 U.S. 912, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976), and 2) the order is "tailored as precisely as possible to the exact needs of the case." *Carroll*, 393 U.S. at 184, 89 S.Ct. at 353. *See also, Levine v. U.S. District Court for the Central District of California*, 764 F.2d 590, 595 (9th Cir.1985); *In Re Halkin*, 598 F.2d 176, 194–95 (D.C.Cir.1979). A valid distinction exists, however, between curtailing the media and silencing the trial participants, especially counsel. *See United States*

for the public. While media representatives enjoy the same right of access as the public, they often are provided special seating and priority of entry so that they may report what people in attendance have seen and heard."

*v. Alberico,* 604 F.2d 1315, 1320 n. 15 (10th Cir.1979); *In Re Halkin,* 598 F.2d at 195 n. 44.

In *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), the Supreme Court stated that a trial court has the power to "proscribe[ ] extrajudicial statements by any lawyer, party, witness, or court official which [might] divulge[ ] prejudicial matters...." *Id.* at 361, 86 S.Ct. at 1521. Justice Brennan analyzed the role of attorneys regarding extrajudicial comments as follows:

> "A significant component of prejudicial pretrial publicity may be traced to public commentary on pending cases by court personnel, law enforcement officials, and the attorneys involved in the case. ... As officers of the court, court personnel and attorneys have a fiduciary responsibility not to engage in public debate that will redound to the detriment of the accused or that will obstruct the fair administration of justice. It is very doubtful that the court would not have the power to control release of information by these individuals in appropriate cases, see *In re Sawyer,* 360 U.S. 622 [79 S.Ct. 1376, 3 L.Ed.2d 1473] (1959), and to impose suitable limitations whose transgression could result in disciplinary proceedings."

*Nebraska Press Association v. Stuart,* 427 U.S. 539, 601 n. 27, 96 S.Ct. 2791, 2823 n. 27, 49 L.Ed.2d 683 (1976) (Brennan, J., concurring).

The Attorney General, to protect and warn consumers, "is clearly authorized to issue a press release *at the time charges are filed* against an alleged violator." (Emphasis supplied). *Consumer Protection Division v. Consumer Publishing Co.,* 304 Md. 731, 765, 501 A.2d 48 (1985). That authority does not, however, confer upon him the right to "try the case in the press." We think the trial court, in light of the contents of the unreleased statement, properly concluded that continuing pretrial comments and news releases emanating from the Attorney General's office would seriously undermine the fair administration of justice. Because the tailoring of the trial court's gag order lacked the

definition necessary to be constitutionally appropriate, this Court altered the order so as to provide a better constitutional fit. We limited the order so as to proscribe only comments relative to the merits of the case.

█ Finally, the Attorney General assails the "gag order" as an impermissible infringement on his constitutional and statutory powers. The trial judge did not encroach upon the Attorney General's discretionary authority regarding the initiation of the suit against Cottman. Once the Attorney General either files suit or enters his appearance in a case, he instantaneously becomes subservient to the proper exercise of judicial authority by the court in that particular case. *See e.g., Hamilton v. Verdow,* 287 Md. 544, 414 A.2d 914 (1980) (whenever a formal claim of executive privilege is made in any legal proceeding, its applicability is a question of law for the court to decide.)