608 A.2d 811

**KEENE CORPORATION**

v.

**ABATE, et al.**

**No. 616, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

July 1, 1992.

F. Ford Loker, Baltimore, and Martin H. Redish, Chicago, Ill. (Whiteford, Taylor & Preston, Baltimore, and Holleb & Coff, Chicago, Ill., on the brief), for appellant.

Timothy E. Eble (Ness, Motley, Loadholt, Richardson & Poole, P.A., Barnwell, S.C., Peter G. Angelos and Patricia J. Kasputys, Baltimore, on the brief), for appellees.

Argued before GARRITY, BLOOM and MOTZ, JJ.

MOTZ, Judge.

The appeal before us is the most recent in the spate of asbestos-related cases winding through the State's court system. The sole question with which we are now faced is whether the Circuit Court for Baltimore City can constitutionally enjoin Keene Corporation ("Keene"), one of several defendants in a trial now underway, from advertising its views, before the jury returns a verdict, on the societal impact of the case and of asbestos litigation in general. Because the First Amendment to the United States Constitution and Article 40 of the Maryland Declaration of Rights prohibit such an injunction, on June 23, 1992, we entered a per curiam order vacating the lower court's order granting the injunction. We now explain the reasons for our decision.

(i)

The trial below began in February of 1992. From the outset, it has generated a great deal of public interest. Members of the White Lung Association have staged numerous demonstrations outside the courthouse, carrying picket signs and handing out fliers. The demonstrations at one point prompted the defendants, including Keene, to move for an injunction against the demonstrators. The trial court refused to grant the injunction because it "felt on a balancing consideration" it "could favor the First Amendment as [it] should and not have a risk to the jury"; instead it instructed the jury to ignore the demonstrators and to attempt to avoid them when entering and exiting the courthouse. One protester nevertheless managed to corner a juror in a courthouse restroom in an effort to relate to the juror a tragic story regarding an asbestos-related illness. The juror immediately reported the incident to the court. The defendants moved for a mistrial which the court, after questioning the juror and instructing her to disregard the restroom conversation, denied.

On May 5, 1992, while evidence in the instant case was still being presented, the plaintiffs/appellees ("plaintiffs")

filed a "Motion for an Order to Show Cause Against Defendant Keene Corporation." The plaintiffs complained that Keene's president and chief executive officer, Glenn W. Bailey, had improperly sent a letter *ex parte* to the trial judge. They asked the court to enjoin Keene from placing in local newspapers advertisements that might interfere with the fair and impartial deliberations of the jury. The plaintiffs informed the trial court that Keene had been a defendant in similar litigation in Houston, Texas. While the jury was deliberating in that case, Bailey placed a paid advertisement in the Houston *Chronicle*. As a result of that advertisement, Keene was found in contempt of court. In another asbestos case, also in Texas, a judge issued an order enjoining Keene from any further "advertising regarding asbestos litigation in any and all newspapers which are published in Harris County, Texas" until the jury reached a verdict. The plaintiffs did not allege below that the advertisement in the Houston *Chronicle* was false or deceptive; in that advertisement, Bailey had complained that asbestos litigation had bankrupted a dozen companies, that Keene alone could be required to pay out millions of dollars, and that 60–percent of the money would go to lawyers.

In the matter *sub judice*, the trial court indicated that it did not intend "to let this trial be aborted" or "to allow the jury to be affected by undue publicity," and so set plaintiffs' motion in for prompt briefing and hearing. Six days later, on May 11, 1992, after hearing argument from counsel, the trial court granted the motion. The court commented that:

Mr. Bailey does not have the absolute right to publish anything he wants with regard to this case. He is writing ex parte letters to this Court which is improper. But of more concern to me is the fact that, as I say, he takes out full page ads in newspapers while juries are deliberating and that is absolutely improper. He should not be allowed to communicate with this jury and that is

all that a full page ad intends to do is to improperly communicate with this jury....

... I am going to sign an order which is adequate to prevent him from placing such an ad which, in my view, has no purpose other than to influence this jury.

In response to defense counsel's argument that such an order would infringe upon Bailey's—and Keene's—First Amendment rights, the trial court stated: "I perceive a fundamental distinction between a newspaper reporter obtaining comment of both sides, Plaintiffs and Defendants, and a man taking out a full-page ad during the pendency of the case." On May 13, the court issued a written order enjoining Keene from "advertising regarding asbestos and/or asbestos litigation in any and all newspapers, television, radio or other media in the Baltimore, Maryland area during the pendency of this trial."

Thereafter, on May 21, Keene placed a paid advertisement in the Philadelphia *Inquirer*. In the advertisement, Keene again complained of the high costs of asbestos litigation and alleged that such litigation is "lawyer-inspired" and is causing "the unnecessary bankrupting of companies." The company suggested legislation that it asserted would bring the perceived problem under control and urged readers to support such legislation.

On May 13, pursuant to Maryland Courts & Judicial Proceedings Code Annotated § 12–303(3)(i), Keene timely noted an appeal to this Court. Because of the important constitutional question involved, we granted Keene's request to expedite consideration and advance the time for briefing and oral argument. In the meantime, Keene moved below to stay the injunction pending the instant appeal. The trial court denied the motion in open court without hearing argument from counsel. It did, however, offer further explanation as to its reasons for initially granting the injunction. The court referred to Glenn Bailey as a "loose cannon" and remarked that, as far as possible advertisements were concerned, "I don't know what he has in mind. And he doesn't favor me with what he wants to

do." It acknowledged that news articles about the trial had been published throughout the pendency of the proceedings, but again stated, "I see a big distinction between a paid ad in the newspaper and a news article, per se." The court opined that "even though I have cautioned my jury not to look at the newspapers, if they see a big bold-faced, full-page advertisement in our newspapers here, there is a risk that they will see it and look at it, even fragmentarily, and I don't think that a court ought to have to put up with that risk." The court commented, on the other hand, that its instructions to the jurors to avoid the demonstrators from the White Lung Association had "worked appropriately." In regard to the advertisement in the Philadelphia *Inquirer,* published after the order enjoining advertisements in the Baltimore area was entered, the court commented that "it would be improper for me to try to enjoin any publication in other newspapers outside of Maryland...."

### (ii)

■ There can be no dispute that the order enjoining Keene from "advertising regarding asbestos and/or asbestos litigation" in any and all media outlets in the Baltimore area during the pendency of the trial operates as a prior restraint on speech. A threshold question, however, is what type of speech the order seeks to regulate. The order anticipates an attempt by Keene to place advertisements, similar to those placed in Houston and Philadelphia, in Baltimore area newspapers. The trial court's distinction "between a paid ad in the newspaper and a news article" suggests that it believed the advertisement amounted to commercial speech. If that was the case, the advertisements would be entitled only to limited protection under the First Amendment and Article 40. *See generally Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 770–73, 96 S.Ct. 1817, 1829–31, 48 L.Ed.2d 346 (1976) (commercial speech afforded First Amendment protection so long as it is not false and misleading and so long as transactions proposed in advertisement

are not themselves illegal). *See also Freedman v. State,* 233 Md. 498, 505, 197 A.2d 232 (1964), *rev'd on other grounds,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965) (Article 40 of the Maryland Declaration of Rights is to be interpreted in *pari materia* with the First Amendment). That is not the proper classification of the advertisements, however.

■■■ Commercial speech is defined as "speech that proposes a commercial transaction." *Board of Trustees, State Univ. of N.Y. v. Fox,* 492 U.S. 469, 482, 109 S.Ct. 3028, 3036, 106 L.Ed.2d 388 (1989) (emphasis omitted) (*citing Virginia Pharmacy Bd.,* 425 U.S. at 761–62, 96 S.Ct. at 1825). In common parlance, "advertising" means "the action of calling something ... to the attention of the public[,] esp[ecially] by means of printed or broadcast paid announcements." *Webster's Third New International Dictionary* 31 (1981). The mere fact that speech is published in the form of a paid advertisement does not render it commercial speech. *See New York Times Co. v. Sullivan,* 376 U.S. 254, 266, 84 S.Ct. 710, 718, 11 L.Ed.2d 686 (1964) (a paid advertisement, regarding the civil rights movement, that "communicated information, expressed opinion, recited grievances, protested claimed abuses, and sought financial support on behalf of a movement whose existence and objectives are matters of the highest public interest and concern" was not commercial speech).

■■ The paid advertisements placed by Keene in the Houston *Chronicle* and the Philadelphia *Inquirer,* like the paid advertisement in *New York Times v. Sullivan,* addressed a matter of public concern. They expressed Keene's point of view, aired its grievances, and, in the case of the Philadelphia *Inquirer* advertisement, proposed legislative solutions. Although the message that asbestos litigation should be controlled clearly promotes Keene's economic interests, the advertisements in no way "propose[d] a commercial transaction." *Board of Trustees, State Univ. of N.Y.,* 492 U.S. at 482, 109 S.Ct. at 3036. Indeed, Keene

contends that it halted production of asbestos products 20 years ago. In short, the advertisements simply cannot be viewed as commercial speech. Because there is no reason to believe that the advertisements fall within any other category of speech warranting less constitutional protection, we can conclude only that they were fully protected.[1]

### (iii)

"[P]rior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 559, 96 S.Ct. 2791, 2803, 49 L.Ed.2d 683 (1976)

---

1. Even assuming, *arguendo,* that the advertisements amounted to commercial speech, it seems clear that an order enjoining similar advertisements in Baltimore area newspapers would be improper. The Supreme Court explained in *Board of Trustees, State Univ. of N.Y.,* 492 U.S. at 480, 109 S.Ct. at 3034, that even restrictions on commercial speech must be "narrowly tailored to achieve the desired objective." In the instant case, the trial court indicated that its objective was to prevent interference with the fair and impartial deliberations of the jury. As we shall discuss *infra,* however, we are not persuaded that the ads posed a threat to those deliberations or that, even if they did, the court's solution was narrowly tailored. *See e.g., Peele v. Attorney Reg. and Disciplinary Comm'n,* 496 U.S. 91, 110 S.Ct. 2281, 110 L.Ed.2d 83 (1990) (rule prohibiting attorneys from truthfully advertising that they were specialists in certain areas of the law struck down because it promoted no substantial state interest); *Shapero v. Kentucky Bar Ass'n,* 486 U.S. 466, 108 S.Ct. 1916, 100 L.Ed.2d 475 (1988) (prohibition on truthful and non-deceptive direct-mail solicitation of potential clients by attorneys struck down because it served no particular objective); *Posadas de Puerto Rico Assoc. v. Tourism Co.,* 478 U.S. 328, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986) (Puerto Rican act prohibiting gambling casinos from advertising locally if such advertisements were directed at residents rather than tourists upheld as being no more extensive than necessary to protect Puerto Rico's citizens from the harmful effects of gambling); *In re R.M.J.,* 455 U.S. 191, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982) (Missouri Supreme Court rule that limited the categories of information allowable in lawyer advertisements struck down because it excluded relevant, truthful information and promoted no substantial State interest); *Linmark Associates, Inc. v. Willingboro,* 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977) (town ordinance that banned the posting of residential "For Sale" signs struck down because there was no indication that it served the stated goal of stabilizing neighborhoods, and because less restrictive measures, such as posting "Not For Sale" signs, were available).

(striking down a court order that enjoined, until the jury was impaneled, certain news coverage in connection with a criminal trial). Moreover, the "conflict between the right to an unbiased jury and the First Amendment is 'almost as old as the Republic.'" *Quinn v. Aetna Life & Cas. Co.*, 482 F.Supp. 22, 27 (E.D.N.Y.1979), *aff'd per curiam*, 616 F.2d 38 (2nd Cir.1980) (*quoting Nebraska Press Ass'n v. Stuart*, 427 U.S. at 547, 96 S.Ct. at 2797). Although the right to a fair trial is jealously guarded, a court seeking to insure a fair trial may not impose a prior restraint unless "the gravity of the 'evil,' discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger." *Nebraska Press Ass'n, supra*, 427 U.S. at 562, 96 S.Ct. at 2804 (*quoting United States v. Dennis*, 183 F.2d 201, 212 (2d Cir.1950), *aff'd*, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951)).

In *State v. Cottman Transmission*, 75 Md.App. 647, 542 A.2d 859 (1988), this Court was called upon to determine the propriety of a trial court's order, issued in a civil case at the defendant's request, which closed the case file and proceedings to all but the participants and prohibited all communications with the press. *Id.* at 649, 542 A.2d 859. The defendant, an auto transmission company accused of various deceptive business practices, had alleged that the State was damaging the company's reputation and business by communicating with the news media during the course of the trial. *Id.* at 653, 542 A.2d 859. We vacated the closure order in its entirety, *id.* at 658, 542 A.2d 859, and vacated the "gag order" to the extent that it prohibited even those communications with the press that did not concern the merits of the case. *Id.* at 661, 542 A.2d 859. We explained that a gag order can be upheld only "1) if the party seeking the order can establish that the speech to be restrained poses a 'serious and imminent threat' of interference with the fair administration of justice, ... and 2) the order is 'tailored as precisely as possible to the exact needs of the case.'" *Id.* at 659, 542 A.2d 859 (citations omitted). *See also, Journal Newspapers, Inc. v. State*, 54 Md.App. 98,

110–12, 456 A.2d 963, *aff'd,* 297 Md. 68, 465 A.2d 426 (1983) (in vacating an order that enjoined certain classes of people from making extrajudicial statements regarding a criminal trial, this Court explained that, once a movant establishes "the need for *any* restriction ... the [trial] court [should] proceed to look at the alternative methods of implementing the restriction, choosing always that or those which will do the job in the least intrusive and onerous manner") (emphasis in original); *CBS, Inc. v. Young,* 522 F.2d 234, 238 (6th Cir.1975) (in vacating an order that prevented parties to civil litigation from commenting to the press, the court noted that "[t]o justify imposition of a prior restraint, the activity restrained must pose a clear and present danger, or a serious or imminent threat to a protected competing interest.... The restraint must be narrowly drawn and cannot be upheld if reasonable alternatives are available having a lesser impact on First Amendment freedoms").

Although *Cottman* involved news coverage rather than paid advertisements, the speech that was the subject of the gag order, as in the instant case, was promulgated by a party to the case. We noted in *Cottman* that "a trial court has the power to 'proscribe[ ] extrajudicial statements by any lawyer, party, witness, or court official which [might] divulge[ ] prejudicial matters....' " 75 Md.App. at 660, 542 A.2d 859 (*quoting Sheppard v. Maxwell,* 384 U.S. 333, 361, 86 S.Ct. 1507, 1521, 16 L.Ed.2d 600 (1966)) (brackets added by *Cottman* Court). Such proscriptions, however, must be narrowly tailored. *See Id.,* 75 Md.App. at 659–61, 542 A.2d 859. In applying the two-prong test set forth in *Cottman* to the particular facts of that case, we recognized that the speech at issue there could indeed interfere with the fair administration of justice by, in effect, trying the case in the press. "Because the tailoring of the trial court's gag order lacked the definition necessary to be constitutionally appropriate, [however,] this Court altered the order so as to provide a better constitutional fit." *Id.* at 660–61, 542 A.2d 859.

█ **373**

■ The trial court's order in the instant case fails to satisfy either prong of the two-prong test enunciated in *Cottman*, 75 Md.App. at 659, 542 A.2d 859.[2] Although the advertisements that appeared in the Houston *Chronicle* and the Philadelphia *Inquirer* complained of the high costs of asbestos litigation, neither advertisement in any way addressed the merits of a particular case. It simply cannot be said that publication of similar advertisements by Baltimore area media, even if viewed by the jurors, would pose a serious and imminent threat to the fair administration of justice.

This Court has explained that the record must contain support for a trial court's finding that a prior restraint is necessary to ensure a fair trial. *Journal Newspapers, supra,* 54 Md.App. at 111, 456 A.2d 963. The record before us contains no such support. Assuming, *arguendo,* that the sort of advertisements at issue here could have an adverse effect upon the trial, steps short of the prior restraint in question, such as careful instructions to the jury or even sequestration, could be taken. *See Nebraska Press Ass'n, supra,* 427 U.S. at 563–64, 96 S.Ct. at 2804–05 (setting forth alternatives to be tried before resorting to

---

**2.** The few cases relied upon by the plaintiffs do not hold to the contrary; indeed, rather than supporting the issuance of the gag order, these authorities demonstrate the weakness of plaintiffs' claim. For example, although plaintiffs cite *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978), for the proposition that "government may limit speech when compelling government interests outweigh free expression interests of the speaker," in fact, in *Landmark,* the Court held that the First Amendment prohibited criminal prosecution of those publishing truthful information regarding confidential judicial inquiry proceedings. *See also Gentile v. State Bar of Nevada,* — U.S. —, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991) (Supreme Court *reversed* lower court and held that a state's application of its rule prohibiting a lawyer from making extrajudicial statements to the press violates the First Amendment); *Sheppard v. Maxwell,* 384 U.S. 333, 335–58, 86 S.Ct. 1507, 1508–20, 16 L.Ed.2d 600 (1966) (even in face of reversal because of extremely prejudicial publicity and carnival-like trial atmosphere, Supreme Court did not advocate prior restraint of press or parties by the trial court).

prior restraint of speech).  The trial court, in denying Keene's earlier request for an injunction, concluded that the jurors could ignore demonstrators who were holding picket signs and distributing fliers outside the courthouse;  that decision has not been challenged on appeal.  It seems clear that properly instructed jurors could equally well ignore news articles and paid advertisements in the local media.

In sum, we are sympathetic to the experienced, long-suffering, trial judge's understandable, indeed commendable, desire to avoid prejudicial publicity and not permit this months-long trial to be "aborted."  The First Amendment and Maryland Declaration of Rights, however, prohibit the use of a prior restraint to accomplish these goals absent the establishment of a serious and imminent threat to the fair administration of justice and an order tailored to the exact needs of the particular case.  Here, such a threat was never demonstrated, nor was such an order fashioned, and so we were required to vacate the judgment of the court below.[3]

---

**3.**  Except for the Texas courts, discussed within, that have sanctioned Keene in other cases, our conclusion here appears to be in accord with that reached by every other court to consider the propriety of a similar injunction on advertising.  *See Quinn v. Aetna Life & Cas. Co., supra,* 482 F.Supp. at 27 (and numerous cases cited therein); *Rutledge v. Liability Insurance Industry,* 487 F.Supp. 5 (W.D.La.1979); *New York Public Interest Research Group, Inc. v. Insurance Information Institute,* 140 Misc.2d 920, 531 N.Y.S.2d 1002 (Sup.Ct.1988), *aff'd,* 161 A.D.2d 204, 554 N.Y.S.2d 590 (1990); *Kemner v. Monsanto Co.,* 112 Ill.2d 223, 97 Ill.Dec. 454, 492 N.E.2d 1327 (1986).