**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Gregory ALBERICO,
Defendant-Appellant.**

**Nos. 78–1053, 78–1062 and 78–1063.**

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted Jan. 23, 1979.

Decided Aug. 24, 1979.

Rehearing Denied Sept. 10, 1979.

Scott H. Robinson of Gerash & Springer, Denver, Colo., for defendant-appellant.

Rod W. Snow, Asst. U. S. Atty., Denver, Colo. (Joseph F. Dolan, U. S. Atty., Denver, Colo., on brief), for plaintiff-appellee.

Before SETH, Chief Judge, and McWILLIAMS and McKAY, Circuit Judges.

McKAY, Circuit Judge.

The defendant was convicted, following a jury trial, on counts of theft of government property,[1] possession of stolen mail,[2] and conspiracy to convert government property.[3] He was acquitted on one count of theft of government property. His appeal raises issues of due process, fair trial, evidentiary insufficiency, prosecutorial impropriety, and cruel and unusual punishment.

The defendant was a United States Army captain assigned as the post administrator of the Rocky Mountain Arsenal in Colorado. He planned to retire from the Army, and was concerned about the economics of

---

[1]. 18 U.S.C. § 641 (1976).

[2]. 18 U.S.C. § 1708 (1976).

[3]. 18 U.S.C. §§ 371, 641 (1976).

retirement. This concern was heightened by substantial gambling debts he had incurred. Utilizing his essentially unchecked access to facilities at the arsenal, the defendant sought to improve his financial situation by selling government property. He does not deny involvement in illicit transfers. His primary defense at trial was one of entrapment.[4]

At trial,[5] the defendant attempted to establish that a network of government agents and informants had caused him to commit crimes. His initial contact with the network came through Bill Martin, an FBI informant who apparently was under investigation for illegal activities himself. Martin participated with the defendant in his dismal gambling endeavors. He also encouraged him to use his status at the arsenal for illicit gain. At the suggestion of FBI agent Richard Castillo,[6] Martin introduced the defendant to Dominic LaRocca, an undercover FBI agent,[7] who indicated that certain government checks in defendant's possession were valuable. Indeed, LaRocca offered $7,300 for these checks. The defendant rejected this offer, but subsequently contacted what later proved to be an FBI storefront operation to inquire about the sale of government property. The telephone number of the storefront operation had been given to defendant by Martin. Martin had, in turn, obtained it from Castillo.

The storefront operation was manned by Michael Kazmier, an undercover FBI agent known to the defendant as Mike Cairo. On several occasions Kazmier received government property from the defendant. The encounters with Kazmier were recorded by hidden microphones and videotape equipment. The defendant presented some evidence—which was challenged—that Kazmier had engaged in harsh threats to induce the defendant to turn over additional government property.[8] Although the defendant did not rely on a defense of duress as such, he argued that the threats were an integral psychological element of the successful effort to entrap him.

The entrapment defense was not accepted by the jury. Defendant's conviction on six of the seven counts charged against him resulted in imposition of a twenty year term of imprisonment and fines totaling $44,000.

### I.

■ Defendant contends that his conviction should be reversed because certain exculpatory evidence was withheld from him by the prosecution. Relying on *Brady v. Maryland,*[9] 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), defendant claims due process was violated by the prosecution's failure to advise him, in advance of trial, that Dominic LaRocca was in fact an FBI undercover agent. Defendant contends that the knowledge of LaRocca's true iden-

---

4. He also challenged the allegations that some of the items illicitly transferred had been shown to have "value" and that other items had been taken from the mail.

5. Trial was originally scheduled for Denver, but defendant successfully moved for a relocation to Grand Junction, Colorado. The basis for defendant's motion was the extensive pretrial publicity generated in the Denver area.

6. Castillo had been assigned to investigate Martin for fraud.

7. LaRocca's true name was Dominic Civitano. His status as an FBI agent was not known to the defendant prior to trial.

8. The government property actually transferred included plastic explosives, a cash register, and

three checks made out to the Rocky Mountain Arsenal.

9. In *Brady,* the defendant had requested before trial to examine the extrajudicial statements of his co-perpetrator, who was to be tried separately. A confession by the latter was withheld by the prosecution and did not come to defendant's attention until after his conviction and sentence had been affirmed on appeal. The Supreme Court held that

the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

373 U.S. at 87, 83 S.Ct. at 1196.

tity prior to trial would have assisted him in establishing an entrapment defense. He also claims it would have permitted more effective cross-examination and a stronger opening statement.

Although we find the nondisclosure troubling, we have concluded that the rule of *Brady v. Maryland* was not violated by the prosecution's pretrial failure to disclose LaRocca's actual identity. The simple fact of the matter is that the identity and involvement of LaRocca were uncovered during the course of trial. Although defense counsel's trial tactics were no doubt affected by the late discovery, he was able to put before the jury the involvement of LaRocca in the alleged entrapment. The Supreme Court has said that *Brady* applies in situations involving "the discovery, *after trial,* of information which had been known to the prosecution but unknown to the defense." *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976) (emphasis added). Here, the information was discovered and presented at trial.

■ The difficulty with defendant's position can be seen from another perspective. *Brady* is implicated only when the evidence withheld is "material." It is noteworthy in this connection that defendant's basic argument is that nondisclosure hampered his trial preparations and affected his litigation strategy. But the Supreme Court has specifically rejected the proposition that the. applicable standard of materiality should focus on the defendant's ability to prepare for trial. *United States v. Agurs,* 427 U.S. at 112 n.20, 96 S.Ct. 2392. Rather, the inquiry is whether presentation of the evidence would have created "a reasonable

doubt of guilt that did not otherwise exist." [10] *Id.* at 112, 96 S.Ct. at 2402. Application of that standard here would be nonsensical, of course, because the evidence *was* presented. Had it not been presented, we would obviously have a much different question before us.

### II.

Defendant's next contention is that his constitutional right to a fair trial was denied by the prosecution's release to the press, with the trial court's acquiescence, of certain prejudicial evidence. Without apparent remorse, the prosecution concedes that it released copies of videotaped encounters between the defendant and Kazmier at the FBI storefront.[11] Selected, incriminating portions of these videotapes were publicly televised on at least two occasions during the course of the trial. Defendant argues that this publicity may have affected the result at trial, either because the jurors viewed it or because acquaintances of the jurors who observed it may have influenced the jurors.

■ The standard for evaluating this issue was indicated by the Supreme Court in *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). After referring to earlier cases in which due process violations had been found, the Court in *Murphy* said of those cases:

They cannot be made to stand for the proposition that juror exposure to information about a state defendant's[12] prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process. To resolve this case, we must turn, therefore, to any indications in

---

**10.** This is the standard that applies when the defense has, as in this case, made a general request for *Brady* material. *See United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

**11.** The government seems to believe that by releasing the videotapes it was merely furthering "the right of the people, through the press, to be informed of the workings of the judicial process." Appellee's Brief at 22. Salutary though this general goal may be, any furtherance of it by the Justice Department would be best left to the Department's Office of Public

Information, rather than to individual assistant United States attorneys in the context of ongoing prosecutions.

**12.** Since *Murphy* arose in the context of habeas corpus review of a state conviction, the Court was limited to considering whether the defendant had been so deprived of a fair trial as to violate his federal due process right. It is what the due process clause requires that we focus on now, and that minimum constitutional requirement is the same for federal and state defendants.

the totality of circumstances that petitioner's trial was not fundamentally fair. 421 U.S. at 799, 95 S.Ct. at 2036. The focus, then, is on the totality of the circumstances at trial.

■ Our review of the record in this case does not reveal that fundamental fairness was lacking in the defendant's trial. Several factors support our conclusion. First, the videotapes from which the television broadcasts were drawn had been shown previously to the jury as a part of the government's case. Second, the defendant relied on the defense of entrapment. In so doing, he admitted the acts giving rise to the prosecution. Therefore, the videotapes merely revealed the commission of acts which the defendant acknowledged he committed. Third, there is no indication that any jurors had been exposed to the broadcasts in any event. The morning after the initial broadcast, the trial court was notified that it had occurred.[13] His response was to ask the jurors whether any of them had either seen the broadcast or discussed it with other individuals. None responded affirmatively.[14]

■ Under the circumstances described, we cannot conclude that any constitutional right of the defendant was violated by the broadcasts. This is not to say that we approve of the prosecutor's conduct in releasing the videotapes to the press. Indeed, we do not. The prosecution is commissioned to try cases in the courtroom, not in the airwaves.[15] Were the circumstances more egregious, we would not hesitate to exercise our supervisory powers and reverse the defendant's conviction. *See Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959); *United States v. Coast of Maine Lobster Co.*, 538 F.2d 899 (1st Cir. 1976).

### III.

The defendant argues that he was improperly convicted of stealing government property to the extent the conviction was

---

**13.** It later appeared that the trial court had prior knowledge of, and had acquiesced in, release of the tapes to the press.

**14.** This procedure was repeated the following day, with the same result. On this second occasion for inquiry, the court assured the jurors that he was not asking about exposure to publicity "with any thought of intimidation or threat." Record, vol. 12, at 17.

In addition to making these inquiries, the court had warned the jurors against discussing the case and had admonished them to avoid television, radio and newspaper accounts of the case. These warnings were repeatedly given throughout the trial.

**15.** The government argues that the court would have imposed a prior restraint on the press if it had refused to permit the prosecution to release the videotapes. Although we need not reach this question, we note that there are some difficulties with the government's contention.

First, it appears that copies of the videotapes may have been released before their admission into evidence. Whatever right the press may have to copies of evidentiary materials, that right does not arise until after the materials become part of the public record. *See Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 609–10, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978); *United States v. Gurney*, 558 F.2d 1202, 1209–10 (5th Cir. 1977), *cert. denied*, 435 U.S. 968, 98 S.Ct. 1606, 56 L.Ed.2d 59 (1978). Even after

such materials become part of the public record, the press is not entitled to absolute access to them. *See Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978).

A second difficulty is with the government's apparent perception that restraints on prosecutorial releases of information are equivalent to, or merge into, restraints on the press. We think there is a difference between imposing limitations on the prosecution and imposing limitations on the press. *See, e. g., Central S.C. Chapter, Soc'y of Prof. Journalists, Sigma Delta Chi v. United States Dist. Court*, 551 F.2d 559, 562–63 (4th Cir. 1977); *Farr v. Pitchess*, 522 F.2d 464, 468–69 (9th Cir. 1975), *cert. denied*, 427 U.S. 912, 96 S.Ct. 3200, 49 L.Ed.2d 1203 (1976); *Central S.C. Chapter, Soc'y of Prof. Journalists, Sigma Delta Chi v. Martin*, 431 F.Supp. 1182, 1188–89 (D.S.C.), *aff'd as modified*, 556 F.2d 706 (4th Cir. 1977), *cert. denied*, 434 U.S. 1022, 98 S.Ct. 749, 54 L.Ed.2d 771 (1978). The prosecution is not free to release or say whatever it wishes about pending cases. *See, e. g.,* Code of Professional Responsibility, DR 7–107(D). Moreover, the court has a responsibility to prevent those over whom it has control—including prosecutors—from frustrating the functions of justice. *See Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 553–54, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976); *Sheppard v. Maxwell*, 384 U.S. 333, 362–63, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

based on the sale to Agent Kazmier of three government checks. He argues that the government failed to prove the checks had any value.

The checks in question were United States Treasury checks drawn on the Kelly Air Force Base, in Texas, and made payable to the Rocky Mountain Arsenal. Each check bore the stamped signature of a United States Air Force disbursing officer. None of the checks were endorsed. The respective face values of the checks were $13,932, $29,538 and $30,096.

■ Stressing the statutory definition of the offense, the defendant argues that the government failed to prove that the checks had any value, much less value of at least $100. The applicable statute provides:

Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or

Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both; but if the value of such property does not exceed the sum of $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

The word "value" means face, par, or market value, or cost price, either wholesale or retail, whichever is greater.

18 U.S.C. § 641 (1976). Correctly observing that the government has the burden of proving the value element of the offense,[16] the defendant argues that the checks were not "things of value" within the ambit of the statute. In particular, the defendant contends that the government failed to show how an individual could cash checks made out to the Rocky Mountain Arsenal. If they had any value, claims the defendant, that could only be established with reference to a thieves' market, and the government failed to show what that market price was.

■ We agree that the government adduced no evidence regarding the checks' value in a thieves' market. We do not think the $7,000 paid by Kazmier for the checks and other materials established such a market price. The storefront price was artificial. Kazmier himself admitted he had no idea what value the checks might have had in a true underworld exchange. Nor do we believe other theories of value advanced by the government, conjectural in nature, were supported by the evidence.[17]

■ We nonetheless affirm the defendant's conviction. Evidence of value in a thieves' market is unnecessary when face value is available. *See, e. g., United States v. Sarkisian*, 545 F.2d 1237 (9th Cir. 1976); *United States v. Lee*, 454 F.2d 190, 192 (9th Cir. 1972) (per curiam). It is available here.

We are not persuaded by defendant's additional argument that conviction was improper because the checks were not shown to have had any intrinsic value to him. He complains that more than face value must be shown, or an individual could be prosecuted for "stealing" an otherwise conven-

16. *See Stevens v. United States*, 297 F.2d 664 (10th Cir. 1961) (per curiam).

17. For example, the prosecution elicited speculative testimony that with sufficient alteration the checks could have been cashed by an individual. But if value were to be demonstrated on this basis, it would be necessary to establish what price the unaltered checks could have commanded in a thieves' market. No such evidence was adduced at trial. The use of rather strained value theories resulted from a perception that the question was somewhat difficult, given testimony that the government was actually "out" nothing as a result of the theft (payment had been stopped) and that checks made out to a government entity could not be cashed by private individuals. This confusion was unnecessary since it was clear that at the time of taking, the checks were negotiable instruments worth their stated face values to Rocky Mountain Arsenal.

tional scrap of government paper on which had been written "$25,000." We concede that defendant makes a plausible argument for requiring an independent intrinsic value standard to be read into the statute, especially since the statutory definition of "value" can be seen as referring to the penalty provisions of § 641, rather than to the earlier reference to "thing of value." But even if we were to adopt defendant's general contention, we would not go so far as to require the government to prove intrinsic value to the *thief.* This would be an unwarranted construction of the statute. It is clear in this case that the checks were valuable to the Rocky Mountain Arsenal at the time they were stolen. Indeed, the face value of the checks defined their worth to the arsenal. The checks were "things of value" for purposes of § 641. Their face value was sufficient to engage the more severe sanctions available under the statute. Defendant's conviction was proper.

### IV.

■ Two additional issues are raised. First, defendant contends that his convictions should be reversed because the storefront operation was improperly funded by the Law Enforcement Assistance Administration.[18] Even if this is true, we do not agree that dismissal of defendant's indictments is the proper remedy for sanctioning unauthorized agency spending.

■ Defendant's final contention is that the constitutional prohibition against cruel and unusual punishment was violated by the court's imposition of fines totaling $44,000 and consecutive sentences totaling 20 years. Defendant particularly complains about the imposition of a five year sentence for conspiracy to steal explosives and imposition of a ten year consecutive sentence for the theft of those same explosives. In im-

18. Defendant argues that only local law enforcement operations—not those of the FBI—should be funded by the LEAA. He refers to 42 U.S.C. §§ 3721, 3724, 3732, 3734 and 3766(a).

19. Although the defendant utilizes an Eighth Amendment rubric in challenging his sentences, most of his argument focuses on the appropriateness of the penalties imposed in light of the circumstances of his case. We are

posing these sanctions, the court emphasized the fact that defendant had supplied large quantities of plastic explosives to individuals he believed to be criminals:

> This is a case in which the defendant, for money, stole from the United States government, from the Army, enough explosives to kill countless people. . . . He thought that he was selling the explosives to persons who were going to use it [sic] in acts of terrorism, and I am totally unable to treat this case as a run-of-the-mill theft case.

Record, vol. 16, at 69. While the sentences imposed seem severe, they are within the limits established by Congress. Those limits are not " 'excessive' in relation to the crime[s] committed." *Coker v. Georgia,* 433 U.S. 584, 592, 97 S.Ct. 2861, 2865, 53 L.Ed.2d 982 (1977). We therefore conclude the Eighth Amendment was not violated.[19]

AFFIRMED.

without power to review the soundness of lawfully imposed sentences that are within the maximum limits established by Congress, when those limits are constitutionally valid. *See, e. g., Dorszynski v. United States,* 418 U.S. 424, 440–41, 94 S.Ct. 3042, 41 L.Ed.2d 855 (1974); *United States v. Baer,* 575 F.2d 1295, 1299 (10th Cir. 1978).