**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Maynard Charles CAMPBELL,**
**Jr., Defendant–Appellant.**

No. 93–10462.

United States Court of Appeals,
Ninth Circuit.

Submitted Oct. 7, 1994 *.

Decided Dec. 5, 1994.

---

* The panel unanimously finds this case suitable for submission on the record and briefs and without oral argument. Fed.R.App.P. 34(a); Ninth Circuit Rule 34–4.

Charles M. Bonneau, Sacramento, CA, Maynard C. Campbell, Jr., in pro. per., Leavenworth, KS, for defendant-appellant.

Rayna S. Becker, Asst. U.S. Atty., Sacramento, CA, for plaintiff-appellee.

Before: GOODWIN, O'SCANNLAIN and KLEINFELD, Circuit Judges.

GOODWIN, Circuit Judge:

Maynard C. Campbell appeals his felony convictions for violating 18 U.S.C. §§ 641 (theft of government property) and 1361 (depredation against government property). Campbell harvested and sold federal timber taken from Forest Service land, and constructed berms on Forest Service roads, without authorization. We have jurisdiction under 28 U.S.C. § 1291. We affirm.

## I. BACKGROUND

This appeal concerns events that occurred on an unpatented mining claim known as the Red Poffrei Extension ("the Extension"), located within the Klamath National Forest. In 1988, Eileen Kunkel owned the Extension. Her late husband, James, had located the Extension in 1952. She also owned a patented mining claim known as Red Poffrei, on land adjacent to the Extension. In 1988, she met the appellant, Maynard Campbell, and the two began mining the Extension the following year. At that time, Campbell had about ten years' experience as a prospector-miner.

In February and March of 1991, Campbell and Kunkel sent notices of intent to the Forest Service pledging that mining activity on the Extension would cover no more than

half an acre and would involve no substantial surface disturbances. They referred the Forest Service to the Extension's 1985 plan of operations for further clarification. The 1985 plan of operations expressly indicated that timber would not be cut without Forest Service approval.

Only one month later, in April 1991, Campbell and Kunkel struck a deal with a commercial logger and a lumber purchaser to cut and sell timber from Red Poffrei and the Extension. Between July and November of that year, approximately nine acres of old growth timber were removed from the Extension.

In January 1992, several months after the timber harvest, Campbell and Kunkel sent a new notice of intent to the Forest Service. The new notice was substantially identical to the 1991 notice and did not indicate that the Extension had already been logged. After receiving the 1992 notice, the Forest Service sought additional assurances that there would be no logging on the Extension. Campbell and Kunkel replied: "Our immediate plans are to complete the patenting process. At this time it appears we should be able to achieve that objective without a tree harvest program.... Our operations are nothing new."

The unauthorized timber harvest was first discovered when wildlife biologists surveying areas within the Klamath National Forest for Northern Spotted Owl Habitat came across several berms, or earthen roadblocks, on a Forest Service access road that ran through the Extension. The biologists grew suspicious, and upon closer inspection discovered the scene of the crime. An undercover agent sent to investigate the Extension discovered that some efforts had been made to conceal the fact that the timber harvest had taken place on federal land. Markers indicating Forest Service boundary lines had been altered. The original corner monument from Red Poffrei, which bore the legend "U.S.D.A. Forest Service, unlawful to disturb," had been moved. Trees formerly adjacent to the moved monument, which had signs on them indicating the distance and direction to the original location of the monument, had that information scratched out. A tree bearing the distance to the original survey points had

been cut and removed. Blaze marks on trees separating the patent land from the patent application land were covered with dirt and brown paint. When asked by the undercover agent about the logging, Campbell did not admit his role, and falsely stated that the trees had been logged by the Forest Service.

After a jury trial, Campbell was found guilty of stealing federal timber and damaging the Forest Service access road. He was sentenced to concurrent 24 month sentences on each count, and ordered to make $30,000 restitution. This appeal followed.

## II. DISCUSSION

### A. Primary Jurisdiction

█ Whether the district court should have applied the doctrine of "primary jurisdiction" to postpone criminal proceedings is a question of law we review *de novo*. *United States v. Yellow Freight System, Inc.*, 762 F.2d 737, 739 (9th Cir.1985).

Campbell argues that criminal proceedings in the district court should have been suspended pending collateral review by the Bureau of Land Management ("BLM"). According to Campbell, the BLM should have been called upon to determine whether BLM's patent application regulations required him to remove trees from the Extension in order to perfect his patent.

█ Campbell did not raise the issue of "primary jurisdiction" until after trial, and it may not now be heard. The entry of a judgment in this case resolved all issues bearing on matters within agency competence. Referral to the BLM at this stage would only produce pointless delay. "The doctrine of primary jurisdiction, despite what the term may imply, does not speak to the jurisdictional power of the federal courts." *United States v. Bessemer and Lake Erie R. Co.*, 717 F.2d 593, 599 (D.C.Cir.1983) (Entry of a nolo plea to a conspiracy charge barred the defendant from raising the doctrine of primary jurisdiction for the first time on appeal.).

## B. Title To The Surface Resources

■ Campbell next argues that the United States did not have legal title to the trees or access road. We review legal questions *de novo*. *United States v. Hughes Aircraft Co., Inc.*, 20 F.3d 974, 977 (9th Cir.1994), cert. denied, ——— U.S. ———, 115 S.Ct. 482, 130 L.Ed.2d 395 (1994).

■ At the time of the unauthorized timber harvest, the Extension was an unpatented mining claim. Until a patent is issued, the government has broad authority to manage public lands. *Swanson v. Babbitt*, 3 F.3d 1348, 1350 (9th Cir.1993).

■ In *United States v. Doremus*, 888 F.2d 630 (9th Cir.1989), two miners cut timber on National Forest lands without an approved plan of operations. We upheld their convictions for damaging "any natural feature or other property of the United States" (36 C.F.R. § 261.9(a)) (1987). We rejected the argument, raised by Campbell on this appeal, that in order to prosecute the government must first prove that the unauthorized logging was not "reasonably incident" to legitimate mining operations under 30 U.S.C. § 612. Here, as in *Doremus*, "[t]he flaw in appellant's argument is that 30 U.S.C. § 612 does not authorize mining operators to act without Forest Service approval, and the operating plan did not authorize the cutting of live trees." *Id.* at 635.

Campbell's reliance upon *United States v. Cruthers*, 523 F.2d 1306 (9th Cir.1975) is misplaced. In *Cruthers*, a miner cut 70 trees from his unpatented claim and used the timber to construct a residential cabin on private property adjacent to the claim, for purposes of working the unpatented claim. *Cruthers* reversed his conviction for timber theft under 18 U.S.C. § 641.

The issue in *Cruthers* was whether, under 30 U.S.C. § 612(c), timber cut from an unpatented mining claim must be used exclusively within the physical limits of the claim to be considered "reasonably incident" to legitimate mining operations. *Cruthers* found no such limitation as to place of use and held that the district court erred by instructing the jury that "a claimant to an unpatented claim may not cut or remove trees or logs for use for any purpose on private property." *Id.* at 1307. *Cruthers* does not hold that trees sprouting from unpatented claims in National Forests may be harvested and sold to a commercial lumber mill by persons lacking authorization from the Forest Service.

## C. Sufficiency Of The Evidence

■ Campbell argues that the government failed to prove that the Extension is subject to post–1955 surface rights. We are constrained to disagree if, "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (Emphasis in original).

The Surface Resources and Multiple Use Act of 1955 ("Surface Resources Act"), Pub.L. No. 84–167, 69 Stat. 367 (codified at 30 U.S.C. §§ 611–612) applies to all unpatented mining claims "hereafter located," 30 U.S.C. § 612(b), that is, located after July 23, 1955, the effective date of the act. Claims located after the date of the Act are subject to express statutory limitations on the miner's rights of use and possession.

Kunkel's pre–1955 surface rights were extinguished pursuant to 30 U.S.C. § 613(a). In 1961, the local Forest Supervisor caused certified mail notices to be sent to mining claimants who had pre–1955 claims. At the same time, notice was published in the Siskiyou Daily News, a newspaper of general circulation in the county in which the Extension is located. In 1961, the Forest Supervisor signed an affidavit that contained a list of those notified, and James Kunkel's name was on that list. Later, a list of all notice letters that had been returned as undelivered was prepared by the Forest Service, and James Kunkel's name was not on that list. Official records of the United States reflect that a surface determination completed on June 30, 1967 indicated that all National Forest Surface management on the Extension was under the Jurisdiction of the National Forest. James Kunkel never disputed this: a plan of operations signed by him in 1985 indicated his acquiescence to sharp limitations on his

**1204**

use of the Extension's surface resources, including a prohibition on logging.

The evidence was sufficient to prove that the Extension is subject to post–1955 surface rights.

## D. Evidentiary Rulings

■ The district court's rulings on the admissibility of evidence are reviewed for abuse of discretion. *United States v. Crespo de Llano,* 838 F.2d 1006, 1018 (9th Cir.1987).

■ Campbell argues that it was an abuse of discretion to allow witnesses to describe the unauthorized logging as a "clear cut" in "Spotted Owl habitat." We disagree. Evidence that Campbell had "clear cut" a nine acre patch of the Extension was surely relevant to refute his claim that the timber was harvested for mining purposes. Evidence that the Extension is a spotted owl preserve was not so clearly irrelevant and prejudicial that it was an abuse of discretion to admit it.

■ Campbell next argues that the district court abused its discretion by excluding from evidence photographs depicting a Forest Service "clear cut" that had been conducted years earlier, on land several miles from the Extension. They were offered to prove that clear cutting is not necessarily "taboo," and that on at least one occasion the government had engaged in more ambitious logging than Campbell. The district court did not abuse its discretion is excluding this marginally relevant evidence.

## E. Jury Instructions

■ Campbell claims that counts two and four of the jury instructions did not correctly charge on the issue of criminal intent. Campbell did not object to the instructions in accordance with Fed.R.Crim.P. 30, which requires a defendant to state distinctly the matter to which he objects and give the grounds of the objection. Campbell did submit alternate instructions, but this is not enough to satisfy Rule 30. *United States v. Williams,* 990 F.2d 507, 511 (9th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 333, 126 L.Ed.2d 278 (1993). We therefore limit review to plain error. *Id.*

■ Plain error is error that is clear under the law and that affects substantial rights. Campbell has the burden to establish that the error was prejudicial. "If these elements are established, the court of appeals should correct a plain error affecting substantial rights if it 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Dorri,* 15 F.3d 888, 891 (9th Cir.1994) (quoting *United States v. Olano,* — U.S. —, —, 113 S.Ct. 1770, 1779, 123 L.Ed.2d 508 (1993)). "In applying the plain error standard we consider all circumstances at trial including the strength of the evidence against the defendant." *Williams* at 512 (quoting *United States v. Chambers,* 918 F.2d 1455, 1459 (9th Cir.1990).

■ On the elements of 18 U.S.C. § 641, the district court read Ninth Circuit Model Criminal Jury Instruction 8.10A, which tracks the holding of *United States v. Seaman,* 18 F.3d 649, 650 (9th Cir.1994):

> The government must prove each of the following elements beyond a reasonable doubt; First, the defendants stole property of value with the intention of depriving the owner of the use or benefit of the property; and Second, the property belonged to the United States. If you decide that a defendant is guilty, you must then decide whether the government has proved beyond a reasonable doubt that the value of the property was more than $100.

Campbell argues that this instruction lacks a requirement of criminal intent.

■ In Instruction No. 18, Judge Garcia charged the jury that Campbell could not be found guilty of depredation of government property unless he:

> willfully injured the specific property of the United States or any department or agency thereof as alleged in the indictment and that the damage inflicted by the defendant was in excess of $100.

Campbell claims that it was error for the district court to leave it at that, without further defining the term "willfully."

In the absence of objection, it was not plain error for the district court to use these instructions.

### F. Amount Of The Loss To The Government

■ Findings of fact underlying the sentence determination are reviewed for clear error. 18 U.S.C. § 3742; *United States v. Uzelac,* 921 F.2d 204, 206 (9th Cir.1990).

■ The district court determined that the loss to the government was between $20,000 and $40,000, giving a six-level enhancement to Campbell's guideline score. USSG § 2B1.1(b)(1). Section 2B1.1 gives the district court wide discretion in evaluating loss. USSG § 2B1.1, comment (n. 3); *United States v. Pemberton,* 904 F.2d 515, 516–17 (9th Cir.1990).

Campbell and Kunkel sold the trees to Roseburg Forest Products for approximately $257,681.30. Out of this amount $118,681.10 went to pay for logging fees, leaving Campbell and Kunkel with $139,000.20. Approximately 10% of the logging occurred on the Extension. The district court set the loss to the government at $25,768.13 (10% of $257,681.30). Campbell argues that this amount erroneously includes the portion of the profit that was spent to cover logging expenses. He measures the loss to the government by subtracting $11,868.10 (10% of $118,681.00) from the $25,768.13 figure arrived at by the district court. He arrives at a loss estimate of $13,900.00, which is also a measure of the net gain to him and Kunkel.[1]

Campbell tries to derive this peculiar valuation method from *United States v. Seaman,* 18 F.3d 649, 651 (9th Cir.1994). In *Seaman,* the defendants illegally removed felled trees from government land and converted them into nine cords of chopped, packaged and seasoned firewood. The evidence showed that the value of nine cords of preprocessed trees was only $45. The value of the processed product was much higher. The court held that the value of preprocessed trees represented the value of the loss to the government, since what were removed from gov-

ernment land were unadulterated trees, whereas "the finished cords of wood offered for sale represented a different product with a greatly enhanced value from the logs originally removed." *Id.* at 651.

We do not subtract the costs of pulling off the caper when we calculate the value of stolen property. Although being cut and carted away is surely a significant event from the perspective of a tree, it is not an economically significant event under *Seaman. Seaman* contemplates a commercial modification of the product stolen. Any commercial modification of the trees taken from the Extension occurred *after* Campbell delivered the virgin timber to Roseburg. We find no error.

### G. Sentence Enhancement For "Reckless Endangerment"

■ The interpretation and application of the Sentencing Guidelines is reviewed *de novo. United States v. Duran,* 4 F.3d 800, 804 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 894, 127 L.Ed.2d 87 (1994). A factual finding that conduct constituted reckless endangerment during flight is reviewed for clear error. *United States v. Young,* 33 F.3d 31 (9th Cir.1994).

USSG 3C1.2 states: "If the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer, increase by two levels." Application Note 3 states that "during flight" is to be construed broadly, and includes conduct "in the course of resisting arrest." The district court made a two-level upward adjustment based on the circumstances surrounding Campbell's apprehension.

■ Campbell was taken into custody after a 12 hour standoff with up to 70 law enforcement officers. During the standoff, he swore that he would not be taken into custody and threatened to kill anyone who tried to arrest him. He also threatened to kill a federal judge and prosecutor, and their

---

1. Campbell's math would not pass muster under GAAP, since he shorts the government out of 3¢.

families too. We do not hesitate to characterize this pre-arrest showdown as a "course of resisting arrest." By arming and barricading himself inside Ms. Kunkel's house, Campbell knowingly created a grave risk that someone would be injured or killed. None of the cases cited by Campbell undermine this conclusion, which, in light of such egregious facts, is no surprise.

■ Campbell lastly argues that the upward enhancement violated the *prohibition* against double jeopardy. We review this argument *de novo. United States v. Nakagawa,* 924 F.2d 800, 802–803 (9th Cir.1991).

In an Oregon prosecution arising out of this incident, Campbell was convicted of violating 18 U.S.C. §§ 115(a)(1) ("Influencing, impeding, or retaliating against a Federal official by threatening or injuring a family member") and 924(c) (Statutory penalty enhancement for carrying or using a firearm during the commission of a felony). The elements of those statutes are not identical to the elements of the reckless endangerment enhancement. Therefore, double jeopardy does not bar Campbell's successive prosecution and punishment. *See United States v. Dixon,* — U.S. —, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993).

### III.   CONCLUSION

Campbell raises many other arguments, but they are meritless. His convictions are therefore

**AFFIRMED.**