**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**
**Byron White United States Courthouse**
**1823 Stout Street**
**Denver, Colorado 80257**
**(303) 844-3157**

Patrick J. Fisher, Jr.
Clerk

Jane B. Howell
Chief Deputy Clerk

November 27, 2001


**TO:** ALL RECIPIENTS OF THE OPINION
**RE:** 00-4141, 00-4144; *United States v. McPhilomy*
Filed November 9, 2001


Please be advised of the following correction to the captioned decision. On page 7, second paragraph, fourth sentence should read, "Although we review the trial court record de novo, id., we do not reverse if. . .".

A copy of the corrected opinion is attached for your convenience.


Sincerely,
Patrick Fisher, Clerk of Court


By:
Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 9 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

MICHAEL McPHILOMY, SR., and
MICHAEL McPHILOMY, JR.,

      Defendants - Appellants.

No. 00-4141 and 00-4144

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D. Ct. Nos. 99-CR-555-01 & 99-CR-555-02)**

---

Submitted on the briefs:

Herschel Bullen and Edwin Stanton Wall, Salt Lake City, Utah, for Appellants.

Paul M. Warner, United States Attorney, and Diana Hagen, Assistant United States Attorney, Salt Lake City, Utah, for Appellee.

---

Before **TACHA**, Chief Judge, **BALDOCK** and **HENRY**, Circuit Judges.

---

**TACHA**, Chief Circuit Judge.

---

      After examining the briefs and the appellate record, this three-judge panel

has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

A jury found Michael McPhilomy, Sr., ("Senior") and Michael McPhilomy, Jr., ("Junior") guilty of two felony counts of aiding and abetting each other in the theft of government property in violation of 18 U.S.C. §§ 2 and 641. The jury also found Junior guilty of one misdemeanor count of depredation of government property in violation of 18 U.S.C. § 1361. The defendants appealed. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I. Background

The convictions arise from the McPhilomys' activities in and removal of materials from the Red Mountain Community Pit near Wendover, Utah. In 1995, the Bureau of Land Management ("BLM") designated the area a community pit. Federal mining regulations define a community pit as follows: "Community pit means a site from which nonexclusive disposals of mineral materials can be made. The establishment of a community pit, when noted on the appropriate Bureau of Land Management records or posted on the ground, constitutes a superior right to remove material as against any subsequent claim or entry of the lands." 43 C.F.R. § 3600.0-5(g). The BLM issues permits for the removal of stone from a community pit, and permittees pay fair market value for the stone. 43 C.F.R.

- 2 -

§ 3604.1(d).

The McPhilomys met with an attorney in late April or early May of 1999 regarding rights to remove materials from the Red Mountain Community Pit. The attorney advised them that they should stake (or "locate") a mining claim, which would entitle them to valuable materials on the site of location, and obtain a permit to remove and purchase common materials from the pit. The permit, advised the attorney, would protect them from theft charges in the event that the materials turned out to be common variety stone, which cannot be the subject of a mining claim.

On May 6, 1999, the McPhilomys met with a BLM official who informed them that they could not obtain a permit to remove stone from the community pit because of unsettled trespass violations in the pit. A trespass notice dated May 6 described the past violations. On July 8, Junior again sought a permit, and BLM officials again informed him and Senior that they could not obtain one. That same day, the McPhilomys returned to the BLM office with another individual, who requested a permit to remove 25 tons of stone from the community pit. The BLM issued him a permit that was valid for 15 days and limited to 5 tons. The permit made clear that stone was available only for noncommercial use and could be extracted only with hand tools. The McPhilomys paid for the permit.

On July 14, 1999, Junior filed a notice of location with the BLM, asserting

that he and others had located a deposit of valuable minerals.[1]  A BLM land law examiner notified the McPhilomys by letter, dated July 26, that their alleged mining claim was within the Red Mountain Community Pit and that they should therefore contact the field office before starting operations.

Also on July 14, 1999, Junior filed a notice of intent to commence mining operations on the mining claim on July 29.  Under the mining regulations, a notice must include certain information, and a mining claimant must file a notice of intent at least 15 days prior to commencing operations on a claim.  43 C.F.R. § 3809.1-3.  A BLM official notified Junior by letter, dated July 20, that the notice of intent was inadequate, that he should complete and submit the enclosed form within 30 days, and that failure to submit the form within that time frame would cause the BLM to treat the notice of intent as withdrawn.  The BLM received the form, partially completed, on August 5.

According to the evidence, however, the McPhilomys began mining operations prior to filing the additional information required for a notice of intent.

---

[1] The locators had filed the claim with the appropriate Utah authority on May 7, 1999.  The notice of location lists 8 locators, including Michael J. McPhilomy, whose name appears without a "Sr." or "Jr." designation, although Michael J. McPhilomy, Jr., appears on the document as the person filing the claim.  This case does not involve charges against the other locators.  According to the record, both McPhilomys were involved in mining operations and asserted the mining claim as a defense.  For these reasons, and for simplicity's sake, we refer to the claim as the McPhilomys'.

Sometime prior to July 23, 1999, they removed and sold a large amount of stone from the pit.[2]  This removal of stone constitutes the basis for the first count of theft of government property.  The events in July are also the basis for the charge against Junior for depredation of government property.

On August 3, 1999, a "Notice of Noncompliance for Failing to File a Complete Notice for Mining Activities in the Red Mountain Area" informed the McPhilomys that they had violated the mining regulations by conducting operations prior to submission of a complete notice of operations.  The notice also advised them that their activities had caused unnecessary and undue degradation of public land and that they must cease operations, remove all mining equipment from the Red Mountain area, and perform reclamation on the disturbed sites.  The notice informed them that future unauthorized operations could result in citation and/or arrest.  The McPhilomys appealed the notice of noncompliance through the administrative process.  The Utah State Director of the BLM upheld the notice.

On September 1, 1999, the McPhilomys forfeited their mining claim because they had failed to pay the $100 annual maintenance fee.  43 C.F.R.

---

[2] The purchaser of the stone testified that the McPhilomys or their employees delivered stone to his home sometime prior to July 23.  He said that, according to the invoice, McPhilomy Trucking Co. delivered 57.25 tons of stone to his home, for a price of $17,175.  A BLM expert who examined the stone at the purchaser's home, however, estimated the weight at 77.15 tons with a retail value of $9,258.

§ 3833.4(a)(2). The BLM mailed a letter confirming the forfeiture on September 22.

On September 8, 1999, the BLM discovered that the McPhilomys were conducting mining operations without a permit or a mining claim. Later that day, a deputy sheriff instructed the McPhilomys to cease operations, but the McPhilomys ignored his instruction. On September 11, a security guard found a truck loaded with stone abandoned at the side of the road. Two days later the deputy sheriff inspected the truck, which he recognized from his earlier encounter with the McPhilomys, in part from the writing on the door of the truck that said "McPhilomy Trucking." The September removal of stone constitutes the basis for the second count of theft of government property.

The United States charged Junior with depredation of government property in violation of 18 U.S.C. § 1361.[3] In addition, the United States charged both McPhilomys with aiding and abetting each other in the theft of government property with a value exceeding $1,000, in violation of 18 U.S.C. §§ 2 and 641. At trial, the McPhilomys' defended themselves on the ground that they had acted either pursuant to a valid mining claim or in good faith pursuit of a mining claim.

---

[3] The depredation of government property charge in the Superceding Indictment alleged that Junior had caused damage exceeding $1,000. The district court found insufficient evidence of damage exceeding $1,000, however, and submitted to the jury only the misdemeanor charge of depredation causing damage of less than $1,000.

A jury returned guilty verdicts on all charges.

## II. Discussion

The McPhilomys appeal their convictions on the following four grounds: (A) insufficiency of the evidence; (B) denial of due process; (C) improper jury instructions; and (D) improper admission of expert testimony.

## A. Sufficiency of the Evidence

First, we address the McPhilomys' claim that the government failed to produce sufficient evidence to support a conviction. The standard of review makes it difficult to prevail on a sufficiency of the evidence claim. United States v. Wilson, 244 F.3d 1208, 1219 (10th Cir.), cert. denied, 121 S. Ct. 2619 (2001). Although we review the trial record de novo, id., we do not reverse if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979).

The McPhilomys argue that the district court erred in failing to grant their motions to dismiss and for judgment of acquittal, because the evidence cannot support two findings: first, that the United States owned the property; and second, that the McPhilomys were not engaged in good faith mining activities. Insufficient evidence of either finding would require reversal for both crimes, as government ownership is an element of each, and good faith is an affirmative

defense that would negate the required mental state for each crime. 18 U.S.C. §§ 641, 1361. After reviewing the record, we find that sufficient evidence supported findings of both government ownership and bad faith.

1. Ownership

Several pieces of evidence support the finding of government ownership. At trial, the government showed that: (1) the United States owns the land from which the McPhilomys took the property; (2) the McPhilomys took property that was common material, which necessarily belongs to the government; and (3) the McPhilomys took the materials without proper authorization.

First, the government demonstrated ownership of the land through the testimony of Michael Ford, a BLM employee. Ford testified that he had assisted in the preparations for creating the Red Mountain Community Pit. Based on personal knowledge from this experience, he testified that the United States owns the land on which the pit is located.

Second, there was sufficient evidence for the jury to conclude that the stone that the McPhilomys removed from the pit was of a common variety, which would make it government property until paid for by someone with a valid permit. Deposits of common varieties of stone are not subject to mining claims, unless a deposit is valuable because "it has some property giving it distinct and special value." 30 U.S.C. § 611. Moreover, "[t]he establishment of a community pit . . .

constitutes a superior right to remove material as against any subsequent claim or entry of the lands." 43 C.F.R. § 3600.0-5(g). Thus, even if the McPhilomys had a mining claim, it would only have provided the right to remove *valuable* mineral deposits from the Red Mountain Community Pit, not *common* variety materials. [4] A government witness, Ford, testified that he had examined the stone that the McPhilomys sold in July and the stone found on the McPhilomys' abandoned truck in September. After comparing their stone with similar materials, Ford identified the McPhilomys' stone as common variety. From this testimony, the jury could rationally have concluded that the McPhilomys removed common variety materials, which the government owned.

Third, there was sufficient evidence to show that the McPhilomys removed materials without proper authorization. Even if the McPhilomys' notice of intent

---

[4] Mining claimants, "so long as they comply with the laws of the United States . . . have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations" and of the valuable mineral deposits within their locations. 30 U.S.C. § 26. To establish a valid mining claim, a claimant must, in addition to complying with state law requirements, mark the boundaries of the area, record the claim with the BLM, and perform at least $100 worth of labor per year until a patent has been obtained. Id. § 28. As a general rule, "all valuable mineral deposits in lands belonging to the United States . . . [are] free and open to exploration and purchase, by citizens of the United States . . . under regulations prescribed by law." Id. § 22. According to BLM officials' testimony and documents that the BLM provided to the McPhilomys, a community pit remains open for the location of valuable minerals. The Interior Board of Land Appeals has also taken this position. Mid-Continent Resources, Inc. and Pitkin Iron Corp., 148 I.B.L.A. 370, 379 (May 14, 1999).

to commence mining operations had been valid, it would not have allowed them to begin mining until July 29.  Nor could the McPhilomys have mined after September 1, because they forfeited any mining claim they had when they failed to pay the required maintenance fee.  The McPhilomys therefore did not have the right to remove stone before July 29 or after September 1, but the purchaser of stone testified that he took delivery prior to July 23 and officials observed the McPhilomys removing stone on September 8.  Thus, a rational jury could have concluded that neither the July nor the September removal of materials constituted authorized activity under a mining claim.  Nor did the McPhilomys ever have a valid permit to remove materials from the community pit.  Their removal of materials in both July and September therefore took place without authorization.

## 2. Good Faith

The evidence at trial was also sufficient to support a finding beyond a reasonable doubt that the McPhilomys were not engaged in good faith pursuit of a mining claim.  Evidence showed that the BLM repeatedly put the McPhilomys on notice that their claims were unlawful.  For example, the BLM informed the McPhilomys that they could not obtain a permit the day before Junior filed a notice of location with state authorities.  Only after Junior had again attempted, without success, to obtain a permit did the McPhilomys file a mining claim with

the BLM. A BLM land law examiner testified that she had advised the McPhilomys that the mining claim was located in a community pit and purported to claim nonlocatable (common) materials and that a mining claim only entitles the claimant to remove locatable (valuable) materials. Other evidence showed that the McPhilomys mined without waiting the required 15 days after filing a notice of intent to commence mining operations, that they continued mining operations and removed materials after the BLM had posted on equipment at the site a notice directing them to cease, and that they continued mining operations and removed materials in September even after officials had approached them and directed them to cease operations. A BLM employee testified that Senior refused to provide the BLM with documentation of his asserted right to remove materials from the pit, that he stated his intention to be on the land "whether the paperwork was done or not," and that he informed her and another BLM official that they "better have a whole bunch of rangers out there to drag him away because one wasn't going to do it." This witness also testified that Junior was present during these conversations. The other BLM official present provided similar testimony as to Senior's statements. In addition, evidence showed that the McPhilomys delivered stone to a purchaser in the middle of the night. Collectively, this evidence provided a sufficient basis for a jury to find beyond a reasonable doubt that the McPhilomys acted with criminal intent and were not engaged in good

faith pursuit of a mining claim.

B. Due Process

The McPhilomys next assert that their convictions violate due process. First, they argue that the government improperly used the criminal process to resolve the validity of a mining claim. Second, they argue that they never received an administrative hearing to determine whether they had located valuable mineral materials. Both arguments fail.

1. Abuse of Process

"[I]t is an abuse of process when a legal procedure is perverted to accomplish an ulterior purpose for which it was not designed." United States v. Miller, 659 F.2d 1029, 1033 (10th Cir. 1981). We find no ulterior purpose in the prosecution of the McPhilomys for theft and depredation of government property.

One ulterior purpose that has been recognized by this court in a somewhat similar context is the use of criminal proceedings to settle a property dispute. Id. In Miller, this court found an abuse of process where a criminal trespass prosecution was brought to settle a good faith property dispute. Unlike in Miller, however, the McPhilomys' prosecution was not a means to resolving a property dispute based on a mining claim. Resolution of the case did not turn on the validity of the mining claim. Rather, the key inquiry was whether, in these particular instances, the McPhilomys' actions constituted either lawful pursuit of

a mining claim or good faith efforts to pursue a mining claim.

We also note that federal statutes and regulations warn individuals who fail to comply with regulations that they may face criminal sanctions. Under the regulations, removing materials "except when authorized by law and the regulations of the Department [of the Interior], is an act of trespass. Trespassers . . . will be subject to prosecution for such unlawful acts." 43 C.F.R. § 9239.0-7. In addition, "persons responsible for such trespass may be prosecuted criminally under any applicable Federal law." Id. § 9239.0-3(b). Moreover, the regulations specify that "[r]ecordation or application involving an unpatented mining claim . . . by itself . . . does not give the owner any rights he is not otherwise entitled to by law." Id. § 3833.5(a). In light of these and other statutes and regulations,[5] the McPhilomys' suggestion that the filing of a mining claim entitled them to disregard federal regulations without risk of criminal sanctions is untenable.

## 2. Lack of an Administrative Hearing

An administrative hearing on whether the McPhilomys had located valuable minerals was not a prerequisite to a criminal action, because the criminal verdict did not depend upon the validity of the mining claim. The McPhilomys presented a defense based on their good faith pursuit of a mining claim, and this defense did not require that their claim be valid. The jury received instructions that discovery

---

[5] See, e.g., 43 U.S.C. § 1733(a); 43 C.F.R. §§ 2800.0-5, 2801.3, 9262.1.

and location of a valuable mineral supports a mining claim, that good faith constituted a complete defense to the charges, and that the government bore the burden of proving criminal intent beyond a reasonable doubt. The verdict reflects the jury's findings that the McPhilomys removed common materials from the community pit, acted with criminal intent, and were not engaged in good faith pursuit of a mining claim.

C. Jury Instructions

The McPhilomys argue that the district court gave defective jury instructions regarding: (1) the community pit designation and other elements of mining law; (2) the measure of the value of the stone; and (3) the government's burden of proof on the issue of good faith.

"We review the district court's decision to give a particular jury instruction for abuse of discretion and consider the instructions as a whole de novo to determine whether they accurately informed the jury of the governing law." United States v. Cerrato-Reyes, 176 F.3d 1253, 1262 (10th Cir. 1999) (citation omitted). After examining the record and the jury instructions under this standard, we find no abuse of discretion in the district court's instructions to the jury.

1. Instruction on the Community Pit

The McPhilomys argue that the district court's instructions misled the jury

regarding the legal effect of the community pit. More specifically, the defendants argue that the instruction that the government had "superior rights" over the community pit misled the jury. After reviewing the instructions as a whole, we cannot agree.

The disputed jury instruction stated, in relevant part:

"Community pit" means a site from which nonexclusive disposals of mineral materials can be made. The establishment of a community pit, when noted on the appropriate Bureau of Land Management records or posted on the ground, constitutes a *superior right* to remove material as against any subsequent claim or entry of the lands.

The district court took this passage from the regulation verbatim, 43 C.F.R. § 3600.0-5(g), making it an accurate statement of the law. The prior paragraph of the instruction also informed the jury that "[s]ome types of designations do not preclude the staking and location of a mining claim."

The court also gave instructions about prospecting, discovery, location, and the requirement that a claimant locate valuable minerals in order to establish a mining claim. The court specifically instructed the members of the jury that they were to decide "[w]hether a particular defendant was attempting to establish a mining claim, that is, whether his activities were prospecting, discovery, or location." These instructions about mining claims would have been wholly irrelevant if the community pit designation precluded new mining claims as a matter of law. While the instruction might have been clearer if it had stated

- 15 -

explicitly that location of a mining claim may occur in a community pit, on the whole, the instructions adequately informed the jury of the relevant law governing mining claims and the effect of the community pit designation.

2. Instruction on the Value of the Stone

The McPhilomys argue that the district court erred in refusing to instruct the jury that the BLM's value of the stone, $7.50 per ton, controls the determination of value. [6]  We cannot agree.

The stone's value is important because the theft charge carries a penalty of a fine and up to ten years' imprisonment only if the value of the stolen property exceeds $1,000.  18 U.S.C. § 641.  For this purpose, "'value' means face, par, or market value, or cost price, either wholesale or retail, whichever is greater."      Id.  The jury instructions quoted this definition of value, and, based on this instruction, the jury found that the value of the stolen property on each count of theft exceeded $1,000.

The evidence showed that the BLM charges permittees $7.50 per ton to remove common variety stone from the Red Mountain Community Pit.  The price that the BLM charges permittees for the stone, however, is not definitive.      The

_____

[6] Applying this price to the highest estimate of tonnage in evidence, the value would not exceed $1,000 on either count.  The prosecution's expert estimated the tonnage in July at 77.15 (77.15 x $7.50 = $578.63) and the tonnage in September at 36 (36 x $7.50 = $270).

phrase "either wholesale or retail, whichever is greater" plainly contemplates a comparison of wholesale and retail prices and does not limit the value to the amount that the BLM would have charged an individual who purchased it through proper procedures. An expert testified that the retail value was $120 or $280 per ton, depending on the size of the particular pieces of stone. The McPhilomys sold the stone for $300 per ton. Using the lowest figure of these figures, $120 per ton, both the value of the stone taken in July (an estimated 77 tons) and the value of the stone taken in September (an estimated 36 tons) would clearly exceed the $1,000 statutory requirement.

We see no reason that someone who removes material from a community pit without authorization should receive the benefit of the government's price for purposes of determining the severity of the crime. The McPhilomys did not comply with the requirements for obtaining stone at the $7.50 a ton price. They employed heavy machinery and removed materials for a commercial purpose, although stipulations for the community pit allow removal only by hand tools and for noncommercial purposes. In other words, even if the McPhilomys had been able to obtain a permit, it would not have allowed them to remove the materials they removed in the manner they removed them at a price of $7.50 per ton.

This holding does not conflict with our previous decisions in United States v. Williams, 50 F.3d 863, 864 (10th Cir. 1995), and United States v. Alberico,

- 17 -

604 F.2d 1315 (10th Cir. 1979). In <u>Williams</u>, we calculated market value based on the value to the victim. That case, however, required assessing "loss" under the Sentencing Guidelines, not "value" under 18 U.S.C. § 641. Moreover, the issue in <u>Williams</u> was limited to determining "market value," while here the value we are seeking could be "either wholesale or retail, whichever is greater."

In <u>Alberico</u>, we affirmed a felony conviction under section 641, because the face value of checks the defendant had stolen clearly exceeded the statutory requirement, and "[e]vidence of value in a thieves' market is unnecessary when face value is available." <u>Id.</u> at 1321. <u>Alberico</u> does not stand for the proposition that a predetermined value must always control, but rather for the proposition that a face value that exceeds the statutory minimum <u>suffices</u> to demonstrate that value exceeds the statutory minimum. As such, the case has no application here.

The defendants ask us to follow the Ninth Circuit's decision in <u>United States v. Seaman</u>, 18 F.3d 649, 651 (9th Cir. 1994), in which that court held that evidence of the price at which the defendants offered to sell firewood did not prove the retail value of the timber the defendants stole, because "the finished cords of wood offered for sale represented a different product with a greatly enhanced value from the logs as originally removed." The Ninth Circuit itself, however, has restricted the applicability of this principle to cases involving a "commercial modification" of the stolen goods, and no commercial modification

occurred here.  United States v. Campbell, 42 F.3d 1199, 1205 (9th Cir. 1994).

Moreover, that court has specifically declined to deduct a thief's expenses for

purposes of determining the value of stolen property,     id., which is precisely what

the McPhilomys ask us to do here.    Seaman, then, even if it were binding on this

court, would not support the defendants' argument.

We therefore hold that the district court did not abuse its discretion and that

its jury instruction properly stated the law.

3. Instruction on Burden of Proof on Good Faith

The McPhilomys also argue that the district court's jury instructions were

erroneous in not requiring the government to prove affirmatively that the

defendants were pursuing their mining claims in bad faith.  After considering the

jury instructions as a whole, however, we find no merit in this argument, as the

court explicitly placed the burden of proof on the government.  The court

instructed:

> If you find that a particular defendant did not have the legal right to
> do what he did, you must consider whether that particular defendant
> had a good faith belief that he was engaged in a bona fide genuine
> effort to establish a mining claim, and thus, that he was not acting
> with the mental state that the United States is required to prove
> beyond a reasonable doubt.

The instruction went on to state that good faith constitutes a "complete defense to

each charge."  The instruction immediately following this one reiterated the

government's burden:

- 19 -

> I want to remind you that a defendant does not have any obligation to prove anything in this case. It is the government's burden to prove to you, beyond a reasonable doubt, that the particular defendant was engaged in the criminal acts charged, that in Count I that Michael McPhilomy, Jr.'s actions were willful, and that in Counts II and III that the particular defendant acted knowingly, with the intention of depriving the United States of the use or benefit of the property taken.

Taken together, these instructions provided the jury with an accurate statement of the law, as did the jury instructions on the other issues challenged by the McPhilomys.

D. Expert Testimony

The McPhilomys argue that the trial court abused its discretion when it allowed the prosecution's expert, Ford, to provide expert testimony on the quality, quantity, and value of the stone. We review the district court's decision to admit expert testimony for abuse of discretion, and we reverse a decision only if it is "manifestly erroneous." General Elec. Co. v. Joiner, 522 U.S. 136, 141-42 (1997) (citations omitted).

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and

methods reliably to the facts of the case.

The trial court must " ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable," Daubert v. Merrill Dow Pharmaceuticals , 509 U.S. 579, 589 (1993). In performing this gatekeeping function, the court's task "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire Co. v. Carmichael , 526 U.S. 137, 152 (1999). In determining reliability, the district court may take into account the expert's personal knowledge and experience. Id. at 150. The trial court has broad discretion to determine whether particular expert testimony is reliable. Id.

1. Quality of the Stone

The McPhilomys specifically challenge the second prong of the test in Rule 702, asserting that Ford did not use sufficiently reliable methodology in determining whether the stone was common variety material.

Ford testified that he held bachelor's and master's degrees in geology and that he had worked for the BLM for 11 years, during which time he had received specialized training in the identification of common and uncommon materials. He stated that he had experience in evaluating mineral materials, including specific experience in evaluating the materials at Red Mountain Community Pit, that his

job required him to decide whether minerals are common or valuable, that he had prepared 30 reports making such determinations, and that the BLM relies on these reports. In reaching his conclusion, Ford personally inspected the material that the McPhilomys removed from Red Mountain Community Pit and considered its physical properties. While Ford's opinion would have been more reliable had he employed more costly and extensive tests, his opinion was sufficiently reliable to be admissible. Given his considerable experience and expertise, his use of the same methodology that he uses as a certified mineral examiner for the BLM, and his firsthand observations, it was not manifestly erroneous for the district court to admit his expert testimony as to the quality of the stone.

2. Quantity of the Stone

In addition to the above qualifications, Ford explained that he had viewed the stone and that he had employed a common method of estimating the tonnage, by estimating the stone's physical volume and then calculating its weight based on data provided for that purpose in a standard BLM publication. Based on this testimony at the <u>Daubert</u> hearing, the district court did not abuse its discretion in finding Ford's testimony as to the quantity of the stone sufficiently relevant and reliable to be admissible.

3. Value of the Stone

Ford testified that, in his capacity as a geologist and certified mineral

examiner for the BLM, he estimated that the retail price for the stone the defendants took was $120 or $280 per ton, depending on the size and shape of the pieces. Ford testified that, in his job, he typically used retail prices for comparable stone from nearby stone yards as a starting point for determining the value of unmined stone on government lands, and he used the same method to estimate the retail value of the stone the defendants removed from Red Mountain Community Pit. He inquired at several stone yards about stone with similar properties and uses as the stone the McPhilomys took from the community pit, examined the comparable stone at the stone yards, and learned prices by asking retailers. Based on Ford's background and application of a standard method, the district court admitted his testimony.

The district court considered Ford's testimony carefully in the Daubert hearing. The court noted that Ford's value figure, though based in part on hearsay, was based on evidence "that reasonably is relied upon by the experts in Mr. Ford's field," making it admissible under Rule 703 of the Federal Rules of Evidence. The court observed that Mr. Ford's training and job responsibilities "focus on the economics of mining," that he had performed a comparison of the different types of stone and their uses, that he had in fact viewed the stones that he used for price comparisons, and that he had found uniform prices. We hold that the district court did not abuse its discretion in admitting the evidence.

## III. Conclusion

In conclusion, we emphasize that this case was a criminal prosecution, not a suit to resolve the validity of a mining claim.  Mining law was relevant because the defendants argued that their actions constituted good faith pursuit of a mining claim.  Ultimately, however, the case turned on rather straightforward inquiries: Did the defendants knowingly aid and abet each other in the theft of government property with a value exceeding $1,000, and did Junior wilfully cause depredation of government property?  Having carefully reviewed the record, we conclude, for the reasons stated above, that the evidence was sufficient to support the jury's affirmative answers to these questions, that no violation of due process occurred, that the court's instructions provided the jury with an accurate statement of the law, and that the district court did not abuse its discretion in admitting expert testimony.

We therefore affirm the convictions.