68 F.3d 484
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 UNITED STATES of America, Plaintiff-Appellee,
v.
Edgar RAMIREZ, Defendant-Appellant.
 No. 94-4191.
 D.C. No. 94-CR-24J.
 United States Court of Appeals, Tenth Circuit.
 Oct. 19, 1995.
 
 Before ANDERSON, McKAY, and BRORBY, Circuit Judges.
 
 ORDER AND JUDGMENT[1]
 
 1
 Mr. Edgar Ramirez was convicted of aiding and abetting in the distribution of cocaine, of carrying, aiding and abetting in the possession of cocaine with the intent to distribute, and of using a firearm during and in relation to the drug trafficking crime. He was sentenced to 78 months imprisonment on the drug counts and 60 consecutive months on the firearm count. We affirm both the conviction and sentence for the reasons set forth below.
 
 
 2
 In early February 1994, Mr. Joe Dean Valdez approached the Drug Enforcement Administration in Salt Lake City, Utah, about making some money as a confidential informant. Agents with the DEA Metro Narcotic Task Force in Salt Lake County, Utah, used Mr. Valdez to set up cocaine transactions which resulted in the arrests of Messrs. Edgar Ramirez, Marco Antonio Salazar, Guillermo Martin Belford, and Rodrigo Quintana-Chavez on February 17, 1994.
 
 
 3
 At trial, Task Force Agent Chris Snyder testified regarding a series of meetings on February 15, 1994, involving Messrs. Valdez, Belford, Ramirez, and other undercover agents, to set up a drug transaction. The meeting culminated on that day with Agent Snyder giving Mr. Ramirez $5,700 in exchange for a quarter-kilogram of cocaine. Mr. Ramirez admitted at trial that he acted as a middle man to obtain a quarter-kilogram of cocaine on behalf of Messrs. Belford and Valdez on February 15, 1994.
 
 
 4
 As the drug transaction on February 15th was completed, Agent Snyder attempted to set up a three-kilo cocaine deal for the next day. After Mr. Belford consulted with Mr. Ramirez in Spanish, Mr. Belford told Agent Snyder that they could sell three kilograms the next day at $23,000 per kilogram. The next day the parties met again, but the deal fell through when Messrs. Ramirez and Belford were unable to supply the three kilograms. Agent Snyder feigned anger and was told by Mr. Belford that they could supply three kilograms the next day, February 17, 1994, at an increased price of $70,000.
 
 
 5
 On February 17, 1994, Mr. Ramirez travelled to Mr. Belford's apartment by bus around 5:00 p.m. to get Mr. Quintana-Chavez purportedly to go target practicing. R. Vol. II, at 469-70. Mr. Ramirez explained at trial that he had a handgun with him for the target practice, and he claimed they were going to take a bus to get more ammunition, then go target shooting.
 
 
 6
 At approximately the same time Agent Snyder and Mr. Valdez went to Mr. Belford's apartment. Mr. Valdez entered the apartment alone and met with Messrs. Belford, Ramirez, Quintana-Chavez, and Salazar. R. Vol. II, at 181. Mr. Valdez testified that he spoke with Mr. Belford and asked whether he had the stuff. Mr. Belford said yes and pointed to Mr. Ramirez. Mr. Ramirez picked up a cereal box, tipped it toward Mr. Valdez, and Mr. Valdez saw foil-wrapped packages about the size of bricks inside the cereal box. Id. at 183-84. Mr. Valdez identified at trial a cereal box later seized from the apartment. Id. at 184.
 
 
 7
 Mr. Belford and Mr. Valdez then left the apartment to meet with Agent Snyder to work out the specifics of the exchange. Agent Snyder refused to exchange the money for cocaine at Mr. Belford's apartment, so Mr. Belford said he would talk to his guys about where to make the exchange. Mr. Belford then returned to the apartment with Mr. Valdez. According to Mr. Valdez, Mr. Quintana-Chavez was absent but Messrs. Ramirez and Salazar were still in the apartment. Mr. Belford spoke in Spanish to Mr. Ramirez after Mr. Valdez asked where they would do the deal. R. Vol. II, at 192-93. Mr. Belford motioned outside to an unknown male in the hallway, who then whistled and motioned to someone downstairs. Mr. Quintana-Chavez then entered with the cereal box that Mr. Ramirez had previously shown Mr. Valdez. Mr. Quintana-Chavez gave the box to Mr. Ramirez who removed three brick size packages from the cereal box. Id. at 194. Mr. Valdez then left the apartment to discuss the exchange with Agent Snyder.
 
 
 8
 Within five minutes Messrs. Belford and Salazar joined Agent Snyder and Mr. Valdez in Agent Snyder's car. Mr. Salazar was carrying a brown grocery bag which contained three, brick-like, foil-wrapped packages. The four drove to a parking lot where another agent was waiting to ostensibly make the exchange. Soon thereafter officers from DEA Metro arrested Mr. Belford and Mr. Salazar. Later, the three packages were tested and weighed and proved to be 2,968 grams of 92 percent pure cocaine. R. Vol. III, at 367-70, 391-92.
 
 
 9
 Mr. Belford gave the DEA Metro officers permission to return to and search his apartment. R. Vol. II, at 323-24. Approximately forty-five minutes after Agent Snyder and the others had left the apartment, DEA special agents reentered the apartment. Mr. Ramirez was opening the door from the inside as the agents opened the door from the outside. Id. at 324-25. The police yelled in English and Spanish for everyone to get down. Mr. Ramirez reached for his waist area several times, even after being taken down to the ground. R. Vol. II, at 326-27; R. Vol. III, at 378. The officers found a fully loaded pistol in his front trouser pocket. R. Vol. II, at 326; R. Vol. III, at 378-79. When arrested, Mr. Ramirez also had some cocaine in his shoe for his personal use, and he gave a false name to the arresting officers.
 
 
 10
 Prior to trial, on May 6, 1994, Mr. Ramirez filed a Request for Exculpatory Information seeking in part:
 
 
 11
 1. The total monetary compensation paid to the Confidential Informant to contact the Defendant, Edgar Ramirez to allegedly sell the controlled substance set forth in Count I.
 
 
 12
 2. All information that the confidential informant has been unable to identify to [sic] Edgar Ramirez in the photographs shown to the confidential informant prior to trial and copies of any photo array used for identification purpose.
 
 
 13
 R. Vol. I, Doc. 51. The government responded to the request in writing by indicating that the only photo display was of the four defendants and stated that the confidential informant had been paid $7,000. R. Vol. I, Doc. 52.
 
 
 14
 At trial, the DEA provided Mr. Ramirez's defense counsel with its "CI file"--the confidential informant file on Mr. Valdez. R. Vol. III, at 410. The file revealed that Mr. Valdez had been given additional payments of $200 and $300 for expenses. Id. After defense counsel received this new information, the trial court permitted defense counsel to reopen its cross examination of Mr. Valdez on June 17, 1994, on the issue of the additional payments. Id. at 421-26.
 
 
 15
 Prior to Mr. Valdez's testimony, Mr. Ramirez's defense counsel learned through Agent Sharp's testimony that Mr. Valdez had been shown six photos on one occasion, and four photos of the defendants on another occasion. R. Vol. II, at 302-03. Agent Sharp stated that within one week of the time of arrest he showed Mr. Valdez six photographs to determine whether Mr. Valdez could identify the defendants in court, and that he included in the array of photos two photos of persons who were not defendants in the case. Id. at 320.
 
 
 16
 Mr. Valdez testified initially that he had been shown four photos. R. Vol. II, at 214. He stated that he was not asked to pick one photo out of the group of photos but that he was asked who the persons were in the photos, and he was able to tell the officer exactly who was in each photograph. On cross examination Mr. Valdez stated that he might have seen six photos at one time and four photos another time, but he also stated that he knew the faces, he just could not associate the names with the faces. R. Vol. III, at 425-26. Mr. Valdez testified that he was paid the cash payments of $200 and $300 before being asked by the DEA to identify photographs of Mr. Ramirez. Id. at 425.
 
 
 17
 Appellant's first assignment of error is that he was denied due process and a fair trial as guaranteed by the United States Constitution under Brady v. Maryland, 373 U.S. 83 (1963), because of the government's failure to produce pretrial discovery under Rule 16 of the Federal Rules of Criminal Procedure and because of misstatements concerning the nature of the information withheld by the government.
 
 
 18
 It is well-established in this circuit that "Brady is not violated when the material requested is made available during trial." United States v. Young, 45 F.3d 1405, 1408 (10th Cir.) (citing United States v. Rogers, 960 F.2d 1501, 1510 (10th Cir.1992)), cert. denied, 115 S.Ct. 2633 (1995); United States v. Alberico, 604 F.2d 1315, 1319 (10th Cir.), cert. denied, 444 U.S. 992 (1979). "To the extent Brady applies where an allegation is made that the government's belated disclosure of material during the trial resulted in prejudice to the defense, the materiality inquiry focuses on whether earlier disclosure would have created a reasonable doubt of guilt." Young, 43 F.3d at 1408 (citations omitted). Courts have noted that a defendant is prejudiced if the material comes so late that it is effectively rendered useless to the defense. Id. (citing United States v. Beale, 921 F.2d 1412 (11th Cir.), cert. denied, 502 U.S. 829 (1991)).
 
 
 19
 It is troubling that the government delayed disclosure of information directly responsive to a specific request by the defendant, although the government claims the delay was inadvertent.[2] Defense counsel's trial tactics were undoubtedly impaired by the late disclosure, but the defense was able to use the information during cross-examination of Mr. Valdez. Our inquiry must focus on whether earlier disclosure would have resulted in a "reasonable probability" of a different result, not on the defendant's ability to prepare for trial. Alberico, 604 F.2d at 1319. The Supreme Court recently explained, "A 'reasonable probability' of a different result is accordingly shown when the Government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " Kyles v. Whitley, 115 S.Ct. 1555, 1566 (1995) (quoting United States v. Bagley, 473 U.S. 667, 678 (1985)). Considering together[3] the photo identification information and the additional payments, we are convinced that there is no reasonable probability that an earlier disclosure of the information would have cast the entire case in such a different light as to undermine confidence in the jury's verdict.
 
 
 20
 In his second ground for appeal Appellant asserts that the government provided insufficient evidence to show that the firearm possessed by Mr. Ramirez at the time of arrest was used in relation to the drug transaction. Appellant's Br. at 26. We review the record de novo when there is a claim of insufficient evidence to support a conviction. United States v. Coleman, 9 F.3d 1480, 1483 (10th Cir.1993), cert. denied, 114 S.Ct. 1234 (1994). The analysis used for a sufficiency of the evidence review is "whether any rational factfinder, viewing the evidence and reasonable inferences therefrom as a whole in the light most favorable to the prosecution, could find the essential elements of the crime beyond a reasonable doubt." United States v. Pike, 36 F.3d 1011, 1013 (10th Cir.1994), cert. denied, 115 S.Ct. 1170 (1995).
 
 
 21
 Appellant's argument that the government failed to prove Mr. Ramirez "used" a firearm in relation to the February 17 drug transaction is misguided. Mr. Ramirez's conviction can be sustained by the government proving he carried the firearm regardless of whether or not he "used" it. Title 18 U.S.C. 924(c)(1) provides in relevant part:
 
 
 22
 Whoever, during and in relation to any crime of violence or drug trafficking crime ... for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years....
 
 
 23
 (Emphasis added).
 
 
 24
 It is undisputed that Mr. Ramirez was arrested with a fully loaded pistol in his front trouser pocket and that he reached for his waist area several times while being arrested. Mr. Ramirez admitted at trial that on February 17 he travelled to Mr. Belford's by bus with the handgun. While at the apartment Mr. Valdez saw Mr. Ramirez handle and display a cereal box containing the three bricks of cocaine. Mr. Belford wanted Agent Snyder to make the exchange of money and cocaine at the apartment. Less than an hour lapsed between the arrest of Mr. Belford and Mr. Salazar away from the apartment and the arrest of Mr. Ramirez at the apartment with his fully loaded gun. Since Mr. Ramirez was travelling by bus on February 17, a rational factfinder could conclude that Mr. Ramirez was carrying the gun in his front trouser pocket when he showed the cocaine to Mr. Valdez. Further, it appears that when arrested he was waiting at the apartment for Mr. Belford and Mr. Salazar to return with the money from the drug transaction.
 
 
 25
 Mr. Ramirez's explanation for carrying the loaded gun is incredible: he stated that he took the bus to the apartment to invite Mr. Quintana-Chavez to go target shooting, yet he only had enough ammunition to fill the gun and it was almost dark outside. The jury could logically infer and conclude beyond a reasonable doubt that he was carrying the gun to protect the drugs or to harm others; his actions in apparently reaching for the gun during his arrest support this reasonable inference and conclusion.
 
 
 26
 The evidence was sufficient to support a conviction under the government's charge that the defendant carried and used a firearm during and in relation to the drug trafficking crime of possession of cocaine with intent to distribute.
 
 
 27
 Finally, Appellant seeks review of the district court's refusal to grant a departure from the United States Sentencing Guidelines based upon mitigating circumstances not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines. Appellant makes two arguments.
 
 
 28
 First, Appellant argues that the district court erred in refusing to find Mr. Ramirez to be a minor or minimal participant in the criminal activity for sentencing purposes. Second, he claims the trial court erred in failing to grant a departure based on his lack of criminal record, his role as an agent for a drug buyer (as opposed to a seller), and his acceptance of responsibility for his conduct for the February 15 drug transaction.
 
 
 29
 A trial court's factual determination as to a defendant's level of criminal participation is a factually intensive process, so the trial court's findings are reviewed under the clearly erroneous standard. United States v. Sukiz-Grado, 22 F.3d 1006, 1009 (10th Cir.1994). We review a district court's legal interpretation of the United States Sentencing Guidelines de novo, but we review application of the Guidelines to the facts by the trial court for clear error. 18 U.S.C. 3742(e); United States v. Sanders, 990 F.2d 582, 583 (10th Cir.), cert. denied, 114 S.Ct. 216 (1993); United States v. Smith, 951 F.2d 1164, 1166 (10th Cir.1991). Sentencing factors considered by a trial court under the Sentencing Guidelines are determined by a preponderance of the evidence. United States v. Underwood, 982 F.2d 426, 429 (10th Cir.1992).
 
 
 30
 The trial court was not clearly erroneous in finding the defendant did not merit a downward departure from the Sentencing Guidelines. The evidence supports a finding that Mr. Ramirez played a significant role in the drug transactions. He sold cocaine in the first transaction. He appears to have participated as an equal in the second transaction since the testimony showed that he told Mr. Belford, in Spanish, what to tell Agent Snyder and he spoke to Mr. Valdez in English regarding the exchange for the February 17 drug transaction. Further, when arrested he possessed and appeared to reach for a loaded gun. The trial court heard all of the trial testimony, including Mr. Ramirez's, and it received and considered Mr. Ramirez's presentence report. The trial court was not clearly erroneous in finding Mr. Ramirez was not a minor or minimal participant since the record contains an abundance of evidence showing the Defendant performed a significant role.
 
 
 31
 As the district court noted, the lack of a prior criminal history is expressly considered by the Guidelines and therefore is not subject to downward departure as a mitigating circumstance inadequately considered by the Sentencing Commission.
 
 
 32
 Neither the record nor the Appellant's brief on appeal contains a clear indication that the Defendant was seeking the downward departure for acceptance of responsibility authorized by the Guidelines. In any event, the record would not support such a departure.
 
 
 33
 The district court gave the defendant's arguments for a downward departure due consideration, and, in accordance with the little discretion provided for under the Sentencing Guidelines, it sentenced Mr. Ramirez at the low end of the Guidelines.
 
 
 34
 Appellant's sentence was within the Sentencing Guideline range, and no downward departures were shown to be warranted.
 
 
 35
 Appellant's conviction and sentence are AFFIRMED.
 
 
 
 [1]
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of the court's General Order filed November 29, 1993. 151 F.R.D. 470
 
 
 [2]
 The DEA agents stated they did not include the $500 as compensation because they viewed the payments as reimbursement for expenses. The agents did not detail, however, what expenses the confidential informant had incurred
 
 
 [3]
 The material effect of belatedly disclosed information must be considered collectively. See 115 S.Ct. at 1567